STATE, *ex rel.* THE POLICE COMMISSIONERS OF THE CITY OF ST. LOUIS, Relators, *v.* THE COUNTY COURT OF ST. LOUIS COUNTY, Respondent.

*State—County—City St. Louis—Constitution—Revenue.*—The moneys acquired by a county from the taxation of its citizens is not the private property of the county, and an act of the General Assembly directing the county to appropriate part of its funds to pay a portion of the police expenses of a city situated within its limits is not an application of property to private uses, and is not the taking of private property to public uses without compensation, the Police Commissioners being an agency of the State Government and performing public duties.

*State—County—Constitution.*—1. An act directing the county to appropriate part of its revenue, already collected, in a particular way, is not unconstitutional, as being retrospective in its operation. It takes away no vested right, nor does it impair the obligation of contracts. The acts of the Legislature providing the objects for which county funds could be appropriated are at all times subject to repeal or alteration, so as to appropriate the funds in a manner, or to objects, different from those before provided. 2. Such act does not violate the principles of taxation laid down in the Constitution. (Hamilton & Treat v. St. Louis County, 15 Mo. 3, affirmed.) 3. A county is not a private corporation, but an agency of the State Government; and while the Legislature cannot take from the county its property, it has full power to direct the mode in which the property shall be used for the benefit of the county.

*Petition for Mandamus.*

*Sharp & Broadhead,* for relators.

I. It is objected by the respondent that the act of the Legislature, of the 5th of February, 1864, gives the Board

of Police Commissioners an unlimited authority to make requisitions upon the county; that the whole revenue of the county is thus subjected to their control, and that this being true, the County Court can never know how to provide for the payment of these requisitions, nor what proportion of the county revenue to set apart for that purpose, nor what taxes to levy.

Whatever force there may be in these objections, so far as the constitutionality of the law is concerned, it is very clear that the law does not bear that construction. In the first place, supposing there were no limit to the estimate which the Police Commissioners may make for the expenses of the police force, as was the case under the act of March 27, 1861, which created the board, except the limit to be inferred from the fact that the law fixes the number of police and the pay which they are to receive, the amendatory act of December 12, 1863, does limit the amount, by declaring, " the whole of said appropriation for police purposes not to exceed the sum of one hundred and seventy-five thousand dollars." (Act of Dec. 12, 1863, § 5.) This act provided for the increase of pay and an increase in the number of police officers, but had made no special provision for an appropriation by the City Council for the expenses of the current fiscal year, caused by this increase of pay; therefore, the second section of the act of February 5, 1864, authorized the City Council to make an additional appropriation for such expenses for the year 1864; and when the fiscal year ended, they can act as before, under the law of 1861, and make their regular annual appropriation.

The third section then goes on to provide, that the county of St. Louis shall be chargeable with one-fourth of this expense and the city with three-fourths. There is no change, either expressly or by implication, in the limit of $175,000 prescribed by the former law; but it is simply provided that the County Court shall make appropriations to meet that proportion (of one-fourth) out of the county treasury. The number of the police force, their pay, and the aggregate

amount which may be demanded by the commissioners, are all limited.

II. It is claimed that there is no money in the county treasury which can be legally appropriated out of the county treasury to pay this requisition, because the County Court is required by the general law to estimate the amount of money required for different purposes connected with the affairs of the county, and to raise money by taxation for those purposes; that the money so raised belongs to those purposes, and cannot be diverted from them.

It is not necessary for us to contend, that the Legislature, which regulated by law the mode and amount of taxation that may be levied upon the inhabitants of a county, and also declares the objects to which the money, when raised, may be applied by the County Court, may also change the law both as to the mode and amount, as well as the direction in which the money may be applied. The ground urged in the second cause of the return is, that the money cannot be appropriated, because it has been raised for a different purpose. Now, it is very clear, that no interest under the peculiar protection of the County Court, whether it be the road interest, the educational interest, or any other interest, can have any vested right in any money raised for those purposes, which is beyond the power of the Legislature to control, until there has been an appropriation or setting apart of the money for those particular purposes.

A county is a public corporation, and public corporations are created and exist for public political purposes; they constitute parts of the political organizations, and are and ought to be subject to changes, alterations, and in most respects to the control of the supreme legislative power of the State. They may be created or altered with the consent of a bare majority of the inhabitants residing within their limits, or without the consent of any of them, (City of St. Louis v. Thos. Allen, 13 Mo. 414,) and may be abolished by the same power without the consent of any of the inhabitants. If any individual, or any number of individuals,

have acquired rights in property under the action of a municipal corporation, legitimately exercised, that is a different question; as, for example, if a man has contracted to build a bridge or a county jail, and money has been raised and appropriated for the purpose of paying him, neither the Legislature nor the county, perhaps, could divert that fund to another object.

The respondent does not deny that there is money in the county treasury sufficient to pay the amount required, nor is it averred that the money has been appropriated to other purposes; but that there is no money which can be legally appropriated, because the money was raised for other purposes. Now, it may turn out that it is very impolitic, contrary to the public interest, that those purposes should be carried out, or that there is some other purpose more important to which the money may be applied. The consent of the corporation is nothing, because it is a public corporation, and has no consent to give, except in accordance with the will of the State. Chief Justice Story says, in the case of Dartmouth College v. Woodward, 4 Wheaton, 518: "Public corporations are such only as are founded by the government for public purposes, where the whole interests belong also to the public; they are such as towns, cities, parishes, and counties." Such corporations can have no property, no interest, which may not be taken away by the effect of legislation.

But, even if the money raised by the county has been appropriated to the object specified, and there be no surplus over and above the appropriation, and no contingent fund for county expenditures, which is not at all probable, it is a very easy thing for the County Court to draw a warrant on the county treasury, to be paid out of any money not otherwise appropriated, or out of the fund for the pay of the police for St. Louis, as provided by this law, and then to levy an additional tax to take up such warrants. The county tax is collected annually. The assessor's books are returnable on or before the first of June of each year, and after

those books are corrected and adjusted, the tax is levied which may be needed under the law. The county, by the general law, is authorized to levy a tax, not exceeding three-fifths of one per cent. The present tax is one-fourth of one per cent. The whole amount required of the county by the law, for the payment of the police force, could not exceed the sum of $43,750. By the general revenue law, the County Court of each county, after the tax-book is corrected and adjusted, shall ascertain the sum necessary to be raised for county purposes, and fix the rates of taxation, so as to raise the required sum. (R. C. 1855, § 2, p. 1350 ; Sess. Acts 1859–60, § 13, p. 521.) This is to be done after the first day of June, in each year, when the assessor's books are returned. There is no difficulty in anticipating this fund, as is often done by drawing the warrant upon it, to be paid when the tax is collected, even if there should be no money on hand at the time of the requisition, and when the assessor's books are returned, to levy a tax to pay it. In this case they refuse to issue the warrant.

It is said that a special tax cannot be levied without an act of the General Assembly authorizing it. As no money can well be raised by the county except by taxation, which is the general mode provided by law for raising money by a county, except what arises from the proceeds of fines and forfeitures, and as the act of February 5, 1864, requires the money to be paid, it may well be held that act authorizes the county to raise it in the manner provided by law for raising funds for other purposes, and that any supposed instructions in former laws are repealed by this act. But the act of March 14, 1859, (Sess. Acts of 1859, p. 448,) will not bear the construction contended for. The fourth clause of the nineteenth section provides that the " total of taxes ordered to be assessed and levied by said Board of County Commissioners, for all purposes, general and special, ordinary and extraordinary, shall not be greater than three-fifths of one per cent." The thirty-first section of the same act provides, " that whenever a deficiency shall occur in the

revenue of the county of St. Louis to meet any necessary expenditures, &c., the Board of County Commissioners (now the County Court) shall make application to the General Assembly to levy a special tax."

It is very clear that a limitation of three-fifths of one per cent. in the amount of taxation that may be levied, is equivalent to a grant of power to levy to the extent of three-fifths, and this extends to all objects of county expenditures, including all purposes, general and special, ordinary and extraordinary. The limitation of power contended for would be inconsistent with this grant and absurd, because it would require the court to ask the Legislature to permit them to do what they are already authorized to do, if it be true that the court has not exhausted the power to levy taxes to the extent of three-fifths. To give force and effect to both sections, the thirty-first section must be so construed as to apply to a case in which the board has already levied to the extent of three-fifths.

III. The constitutional objections urged against the validity of the act are three-fold:

1. That it is retrospective in its operation.

2. That it appropriates private property without just compensation.

3. That it violates the principles of taxation as laid down in the Constitution.

In regard to the first objection, it may be remarked, that a law which neither defeats nor impairs any existing right, can hardly be said to be retrospective in its operation, in the sense contemplated by the Constitution. If a debt is created by the State, without any means being provided for its payment, and the Legislature should afterwards provide for raising the money by taxation, such a law would be equally retrospective in its operation, and yet such legislation would unquestionably be within the power of the Legislature, because instead of violating any existing right, it only imposes a new obligation upon the citizen; and the fact that a debt or obligation had already been incurred by a part of the

community, by a corporation, or by an individual, would not change the nature of the case ; on the contrary, it would be the highest duty of the Legislature to equalize burdens as far as possible, whenever the object to be accomplished is for the public good, and that must be determined by the Legislature, and is altogether beyond the province of the judiciary. It would hardly be contended that the Legislature might not lend or give the money or credit of the State to a railroad company, either to relieve it from existing obligations or to aid in its future construction and operation, when such a course may be supposed to be for the public good ; and who is to determine whether the Legislature judged wisely or not ?

The other two constitutional objections may be treated of together, for the questions run into each other so that it is difficult to separate them. The great fallacy of the objections consists in the fact that a proper distinction is not made between public municipal corporations and private corporations or individuals. Municipal corporations cannot properly be said to have any vested rights which may not be interfered with by the supreme legislative power of the State ; they are mere agencies of the State, created for the purpose of more conveniently carrying out the objects of State policy, and in the absence of any express constitutional prohibition may be entirely changed, or even legislated out of existence, without the consent of any of the inhabitants composing them.

"Plenary power in the Legislature for all purposes of civil government, is the rule ; a prohibition to exercise a particular power, is an exception" (15 N. Y. 543, case of the Metropolitan Police Commissioners). "As a political society, the State has an interest in the repression of disorder and the maintenance of peace and security in every locality within its limits ; and if from exceptional causes the public good requires that legislation, either permanent or temporary, be directed towards any particular locality, whether consisting of one county or several counties, it is within the discretion of the Legislature to apply such legis-

lation as in its judgment the exigency of the case may require; and it is the sole judge of the existence of such causes" (id. 544).

In the case before the court there are two municipal corporations, one the county and the other the city; one embraced within the territorial limits of the other; both created for the public convenience; both agencies of the State for public purposes, authorized to raise money by taxation; and the money thus raised under the control of the State, to be disposed of as the Legislature may direct. Whatever may be done by either the city or the county, is the act of the Legislature through these agencies. This is the view taken by Judge Leonard in Wells v. The City of Weston, 22 Mo. 389. As a general proposition, he says, the Legislature cannot delegate its legislative power; but it has become a practice to do so in the creation of municipal corporations. " This authority to tax may undoubtedly be delegated to subordinate agencies, such as county tribunals and municipal corporations, to be assessed and applied locally." It is absurd, therefore, to treat these " subordinate agencies " as if they had rights and franchises similar to those held by individuals or private corporations. Can any one doubt the power of the Legislature to order by law the removal of the county seat from the city of St. Louis to some other point in the county; the sale of the courthouse and all the public buildings? If money has been raised by taxation in any particular county, what is to prohibit the Legislature from applying the money so raised to any object which may be thought best for the promotion of the public welfare? And in the case before the court, it is not pretended that the money required is not now in the county treasury. This is upon the idea that there is no necessity to resort to a special tax to raise the money, and the act of February 5, 1864, says nothing about taxation. If the money is in the county treasury, raised for one purpose, what is to prevent the Legislature from applying it to another purpose? Why may not money raised by taxation for road purposes, or for the

purposes of building bridges, be applied to school purposes or to quarantine purposes, or to military or police purposes ? The County Court could not so apply it, because their authority is limited; they are "subordinate agencies;" but to deny the Legislature this authority is to deny that body the power to legislate for the public good.

In the case before the court, the money is in the county treasury ; it has been raised by taxation upon the people of the whole county ; the city of St. Louis is within the limits of the county ; its inhabitants constitute a portion of the people of the county, and no inconsiderable portion ; and it is proposed by the act in question to appropriate a portion of the money thus raised to purposes within that portion of the county which is called the city of St. Louis. Who but the Legislature is to determine whether it is or is not for the benefit of the whole county, for the public benefit ?

A company has been incorporated to build a bridge across the Missouri river, at St. Charles—is there any prohibition in the Constitution against the passage of an act authorizing and requiring the county of St. Louis to apply the money raised by taxation for road purposes, or the proceeds of fines and forfeitures which come into the county treasury and are not raised by taxation, to aid in the construction of this bridge ? It is true such an act may indirectly aid the company, but it benefits the public also. (Bank of Rome v. Village of Rome, 18 N. Y. 43.) Money raised by taxation by a county tribunal, or money which comes into the county treasury from other sources, is not private property in any sense of the term, and an act of the Legislature which merely seeks to divert that property from one purpose and apply it to another is not in violation of that provision of the Constitution which forbids the taking of private property without compensation. It is public property, and may be used by the State for public or private purposes, in its discretion, as has been the practice from the foundation of the State Government. It may be given away in charities, for the relief of the poor and the decrepid ; it may be applied

to some great object of general interest. Who is there that can gainsay it? What individual is there in the county who can say, " That, or a portion of it, is my money ; I paid it for a particular purpose; and if you undertake to divert it from that purpose, the act is void and the money reverts to me " ? But, suppose the money is not in the county treasury, and the whole of it has to be raised by taxation upon the citizens of the county, what principle of taxation, laid down in the Constitution, does it violate ? It is admitted that " the Legislature possesses the uncontrolled power of taxation," limited only by the restriction that " all property subject to taxation shall be taxed in proportion to its value," and that this authority may be delegated to subordinate agencies, such as county tribunals and municipal corporations, to be assessed and applied locally." (Wells v. City of Weston, 22 Mo. 389 ; People v. Mayor, &c., of Brooklyn, 4 N. Y. 426 ; Providence Bank v. Billings & Pittman, 4 Peters, 563 ; McCullough v. Maryland, 4 Wheat. 316.) In the case of Wells v. The City of Weston, it is not denied that the Legislature may exercise the very power denied to said city. It is said, "no instance can be found where these corporations have been clothed with power to tax others not within their local jurisdiction, for their own local purposes ; and if the Legislature possess the power now claimed over private property, they ought to exercise it themselves, and not delegate it to those whose interest it is to abuse it." So that it is not the power of the Legislature to tax in the particular way complained of, which is put in issue and denied by the court in that case, but the power of the Legislature to create a municipal corporation with that power ; the corporation can only be authorized to " assess and apply the tax locally," that is, within the territorial limits of the municipality, and that is all that is decided in the case. The same doctrine is held in the case of the Bank of Rome v. The Village of Rome, 18 N. Y. 43, heretofore referred to ; and so in the case of Morford v. Unger, 8 Iowa, 82. There the Legislature, by act, extended the limits of the city of Muscatine

so as to embrace the property of the plaintiff, which was agricultural land.

This doctrine is not denied, and the reason of the rule is obvious ; the Legislature cannot under the pretence of creating a corporation for one purpose, authorize it to be used for an entirely different purpose, or vest it with powers not within the purview of such a corporation.

To say that one particular locality in the county will be more benefitted than another, and that the Legislature cannot levy a tax the operation of which will create a disproportion between its benefits and its burdens, is to deny all power of taxation.

Our Constitution does not require equality in taxation. In Hamilton and Treat v. St. Louis County, this court holds that the " idea of equality in taxation is not the prominent idea" conveyed by the clause of the Constitution above referred to, but rather the contrary.

And so in the 27th Mo., 499, the court says : " Equality of taxation may be regarded as one of those Utopian visions which neither philosopher nor legislator has ever yet realized."

The taxing power may be abused and often works great injustice, even when exercised by wise and virtuous legislators ; but, as Chief Justice Marshall says in Providence Bank v. Billings and Pittman, " the interest, justice and wisdom of the representative body, and its relations with its constituents, furnish the only security where there is no express contract against unjust and excessive taxation, as well as against unwise legislation generally."

The case of the Mayor and Aldermen of Nashville v. Towns, 5 Sneed, 184, cited by respondent, is clearly not an authority in point. The decision in that case was upon a clause in the Constitution of Tennessee, which reads as follows : " The General Assembly shall have power to authorize the several *counties* and *incorporated towns* in this State to impose taxes for county and corporation purposes respectively, in such manner as shall be prescribed by law."

This was clearly a limitation upon the power of the Legislature, which forbade their passing a law authorizing one municipal corporation to impose taxes for the benefit of another ; and hence the law which authorized and required the portion of the county revenue raised within the city of Nashville to be paid into the city treasury for city purposes was unconstitutional. There is no such clause in our Constitution. In the absence of this clause of the Constitution of the State of Tennessee, the Legislature would have the same unlimited power of taxation which is conceded to the State of Missouri.

We claim that all these questions are settled by the comprehensive opinion of Judge Gamble, in the case of Hamilton and Treat v. The County of St. Louis, 15 Mo. In that case the county is required, by the act of the Legislature, to pay the increased salary of the judges. The same objections substantially were raised in that case as in this, to the constitutionality of the act, and the law was held to be constitutional.

*S. H. Gardner,* for respondent.

The court at this time is called upon to determine the constitutionality of the "Act to provide for the payment of the police of the city of St. Louis," approved February 5, 1864. The particular portion of said act under which the writ in this case was issued, and which the respondent claims is unconstitutional, is the 3d section, and is in these words:

"The county of St. Louis shall be chargeable with one-fourth of the whole expense of the police force of said city of St. Louis for the year 1864, and for each year thereafter ; and the County Court of said county shall, from time to time, appropriate money out of the county treasury to meet the proportion of said expense; and whenever the said Board of Police Commissioners shall need money to meet the expense of said police force, they shall make requisition upon said county for one-fourth, and upon the said city for three-fourths thereof."

This section of the act has at least one merit; it is clear, concise, unmistakable in its meaning; there is nothing ambiguous or uncertain about it. It demands that one-fourth of the expenses of the city police, whatever that may happen to be, shall be paid over to the Police Commissioners whenever it may be required by them. The County Court must from time to time make appropriations, and stand prepared with the money in hand ready to meet such requi· sitions as may be made upon it. So far as the County Court can know, it may be to-day, seven thousand dollars; to-morrow, seventy thousand.

The respondent insists,

1. That to compel the county without its consent to contribute towards the support of the city police, is the taking of private property without compensation in such sense as comes within the prohibition of the Constitution. It must be conceded, that whether or not the county has now in its treasury such an amount of funds, that the sum at present demanded could be paid without actually embarrassing the county; yet if the drain upon the county treasury is to be kept up as is contemplated in the act in question, the county authorities must eventually, and that at no distant period, resort to special taxation to meet these demands. It then resolves itself into this: The County Court is required by this act to levy and collect from the taxable persons and property in the county, a sum of money, not for county or State purposes, but for the benefit of another, I had almost said a foreign corporation. Both the city and county organizations are instituted as well for the convenient government of the State, as for some supposed advantages to be derived therefrom by those residing within their respective limits. The Legislature may tax the property in the city and county alike for State purposes. It may legally delegate to the county authorities the power to tax all property within the limits of the county for county purposes; and so it may delegate to the city corporation the power to tax all property within the city limits for city purposes, and to this

power it is also conceded there is no limit; that is, the Legislature may authorize both the city and county to tax all property within their respective limits, even to the full value of the property itself.

But there is a limit to this delegated power of taxation. It may be considered as a settled principle of law, that the Legislature cannot authorize a municipal corporation to tax any property outside of its limits for local purposes. It is true, in the case at bar the act does not in words direct or require the levy of any tax by any one. But the effect of it is to compel the County Court to levy a tax to raise the money. The mere agency through which the tax is to be levied is of no consequence; this court, in determining the constitutionality of the law, will look only to the source of taxation from which the money is to be derived, and the purpose to which the money is to be applied. This money is to be collected from the whole body of the county; it is to be used for the benefit of the city organization alone. Is it not, then, exactly the same thing in effect and in principle as if the Legislature had undertaken to authorize the city government to levy a tax on all the property within the limits of the county to raise a fund for the support of the city police? It is immaterial whether it is called a tax, or by some less objectionable name; or whether, as in this case, naming it at all is carefully avoided. It is a tax upon property outside of the city limits, for the benefit of the city organization. It is entirely immaterial to the tax payer who is called upon to pay, whether the tax is levied by the city or county. The outrage is equally great, if he is thus compelled to support against his will a corporation in which he has no interest, and whose protection he does not enjoy. The same object would have been accomplished had the third section of the act in question been omitted entirely, and the first section been amended by striking out the words " in said city," and inserting in lieu thereof the words " in the county of St. Louis." No one then would have been bold enough to have attempted to enforce such a law, and yet it is now

sought to accomplish by indirection what it must be conceded could not have been done directly ; that is, to impose the burden of a city government upon those outside of its municipal limits.

But if it be said that this is not the exercise of the taxing power, the same result will follow ; for, as was held in Cheaney v. Hoover, (9 B. Monroe, 330,) it makes no difference in principle under what form the power is confessedly exercised, whether in that of laying or authorizing a tax, or any other form, if the operation of the law is to appropriate to the use of the city the property of individuals not within its local jurisdiction, it must be regarded as coming within the prohibition of the Constitution designed to protect private rights against oppressions however made, and whether under the color of recognized power or not; and this principle is fully recognized and established as the law of this State in the case of Wells v. The City of Weston, (22 Mo. 385,) where it was decided that the Legislature cannot authorize a municipal corporation to tax, for its own local purposes, lands lying beyond its corporate limits. Judge Leonard, in his learned and able opinion in that case, while conceding to the Legislature the uncontrolled power of taxation, subject only to the constitutional restriction, that " all property subject to taxation shall be taxed in proportion to its value," and conceding also its right to delegate to subordinate agencies the power of taxation for local purposes, denied that the Legislature could authorize a municipal corporation to impose a tax upon the lands lying beyond its limits ; or, in other words, arbitrarily under the mask of a tax, to take annually from those who are without its jurisdiction a certain portion of their property. The case at bar is, if possible, stronger than that of Wells v. The City of Weston. Here, not even the flimsy mask of the word " tax" is used. It is the bold highwayman who says " Stand and deliver—your money or your life."

The reasoning of the court in the case above cited shows that the power attempted to be exercised by the city of

Weston was regarded as the arbitrary seizure of private property for private uses, and as such was held to be unconstitutional. This case has been approved and followed in the case of Morford v. Unger, (8 Iowa, 93.) The general principle running through these cases, and the principle upon which respondent submits this case should be decided, is, that no person or property outside of the limits of a municipal corporation can be taxed or taken, or in any manner required to contribute towards the support or maintenance of such corporation.

The opinion of the court in the case of Hamilton and Treat, Judges, v. St. Louis County Court, (15 Mo. 20,) when carefully examined, will be found to differ in no respect from the principles above stated. The reasoning of the court in that case, when applied to the facts in the case at bar, fully sustain the position assumed by the respondent. In that case the court held that the county was bound to pay the salary of the judges, simply and solely because it was properly a county charge. They were the judges of the Circuit and Common Pleas Courts of St. Louis county (not of the city of St. Louis); their jurisdiction was co-extensive in name and reality with the county, and the Legislature was authorized to impose the burdens arising from local works or services upon the inhabitants of the locality benefitted. Is it not apparent that if the application had been to compel the county to pay the salary of the mayor, or any other mere city official, Judge Gamble's course of reasoning would have inevitably led to the conclusion that the locality benefitted, that is, the city of St. Louis, should alone bear the burden? In that case, also, the court expressly repudiated the idea that the State can appropriate and apply to its own use the money in the county treasury.

If it be once conceded that the Legislature can compel the citizens of the whole county to contribute to the support of the city government in any degree, there is then nothing to prevent the whole expense of that government being drawn from the county treasury but the ill-regulated and despotic

will of fluctuating and hasty legislation. (Sedgwick on Stat. & Const. Law, 974.)

If the property in Carondelet may be taxed to support the police of St. Louis, of course the rule may be reversed and we may be forced to pay the salary of the mayor of Carondelet; and, if so, why not of St. Joseph? There is no legal connection whatever between the county of St. Louis and the city, by which one corporation may be made answerable for the debts or obligations of the other. They are as distinct and independent of each other as if they were hundreds of miles apart. The mere fact that the territory of one is situated within the bounds of the other, is no more a reason why the one should be forced to contribute its money to the support of the other, than is the fact that both happen to be called "St. Louis."

But even if they were coterminus in extent, and all the inhabitants of the county enjoyed to an equal degree the protection of the police of the city, that would still be no reason why the treasury of the county, which is constituted solely for county purposes, should be burthened with charges properly belonging to the city.

That portion of the bill of rights relating to taxation may be justly regarded as the outline, and the recognition of the essential principle which requires that the burdens and expenses of government should, as far as practicable, be equally and impartially distributed. It is difficult to suppose that the framers of a system of government professing to be founded on equal rights and duties, should manifest such solicitude to secure an *ad valorem* taxation, and yet disregard the more important principles which lay at the very foundation of the government they were about to establish. Now the only equality and uniformity which can exist in a State, organized as ours is, consists in requiring each political sub-division, whether of city or county, to pay its own expenses. So far as the statute in question deviates from this principle, it is in derogation of the common rights of the citizen, and ought to be declared inoperative and void.

What would be thought of a statute creating a new county, and providing that the expenses of the county organization, such as the salary of the county judges, and the cost of erecting a courthouse, should be paid by the adjoining counties or out of the State treasury?

Again, the county is a corporation authorized by law to acquire and hold property and money in its corporate name, and to dispose of the same: when that money or property is once acquired and reduced to possession, it becomes private property, and is placed beyond the reach of the legislative branch of the government in the same manner that the property of every citizen is held sacred from the reach of the Legislature. It can only be reached by the judiciary and in the forms prescribed by law, or by just and legitimate taxation.

The county has title to the grounds upon which this courthouse stands, to the county farm, to the Smizer farm. These may all be taken for public uses upon just compensation; but will it be contended that the Legislature can arbitrarily vest the title to the whole or any portion of this property in the city of St. Louis, merely because this courthouse would make a convenient police station and calaboose, and save the city the expense of a new one? If, then, the Legislature cannot transfer the county's real estate to the city, upon what principle can it take the money of the county and apply it to the benefit of the city? The naked statute, as it stands, simply takes money from the county and gives it to the city. Chief Justice Story covers the whole ground when he says, " we know of no case in which a legislative act to transfer the property of A to B, without his consent, has ever been held a constitutional exercise of legislative power in any State of the Union." (2 Peters, 658.) But when this act is to be carried into effect, it then practically becomes a question of taxation, and that question is the right of the Legislature to tax, or to authorize, either directly or indirectly, a tax to be levied on the citizens of the county

for the benefit of the city alone, and upon this point it is insisted the case of Wells v. The City of Weston, above referred to, is conclusive. If the Legislature could not authorize the municipal corporation of Weston to tax property adjacent to the corporate limits and to the distance of one-half mile, how much less should property lying twenty miles from the municipal limits of St. Louis be taxed to support the police of said city, who are by law confined to its limits; and it is confidently asserted that no instance can be found where these corporations have been authorized to tax property not within their local jurisdiction for their own local purposes.

Again, in so far as the money now in the county treasury is concerned, we insist that it cannot be thus legislated out of the treasury; that it would be an act of injustice and bad faith to other county creditors to do so; that money has been raised for specific purposes. Shall it be taken from the school fund, the road fund, the courthouse fund, the interest fund, or the fund raised to pay salaries? And yet, if the amount now demanded, and what may be called for to-morrow and the next day, is to be paid on demand, it must come from one or all these funds.

In the case of Dartmouth College v. Woodward, 4 Wheaton, 700, et seq., it was said, any act of a Legislature which undertakes to divert the funds of a corporation from the purposes for which they were raised, or which undertakes to impose on a corporation the payment of a debt not incurred by it, is unconstitutional and void. This same principle is recognized in a very late case in Wisconsin, (The State, ex rel. Soulter, v. The Common Council of Madison, 15 Wisconsin,) in which it is held, that where the charter of a city, at the time of the issue and sale of its bonds, made it the duty of the Common Council, when any judgment should be rendered against the city, to levy and collect the amount like any other city or ward charges, and declared that private property should not be taken in execution to

pay any city debt, a subsequent act of the Legislature, prohibiting the city from levying such a tax as would be necessary to discharge a judgment rendered against it for interest on said bonds, would deprive the creditor of the only efficient means of collecting his debt, and would be repugnant to the Constitution.

In the form in which this matter now presents itself to this court, it is a direct appropriation by the Legislature of money in the county treasury and against the consent of the county. But we insist that the Legislature cannot pass the title to the real estate of the county, nor can it transfer the money of the county to its own treasury, much less can it transfer it to other corporations or private individuals. This point has also been well settled by this court. By an act approved January 21, 1857, the County Court of Caldwell county was directed to pay to one Wilbur F. Boggs a certain sum of money, for services rendered by him to the county. This act came under consideration in the case of Boggs v. Caldwell Co., 28 Mo. 586. The court said, " it is insisted that the law is unconstitutional, and of this we entertain no doubt." See also Mayor & Aldermen of Nashville v. Towns, 5 Sneed, 186.

Compare that law with the one now under consideration. Both are positive demands upon the county treasury ; the one is, however, for a mere trifle, to pay what the Legislature, doubtless, considered a just debt of the county, while the other is for an indefinite amount, only limited by the capacity of the Police Commissioners to expend money, and is to be drawn in such sums and at such times as may suit the whims or caprices of a body of men not responsible to or in any manner under the control of the county authorities ; and the money, when drawn, is to be applied to a purpose entirely foreign to the object for which the money was raised, and for the benefit of a corporation in which a large number of the citizens of the county have no interest and from which they derive no benefit.

In summing up this branch of the case, we say, this act must be treated, as it appears on its face to be, as a direct appropriation by the Legislature of money supposed to be in the county treasury ; or it must be regarded as an act requiring the levy of a tax throughout the county, and outside the municipal limits of the city, for the sole benefit of the city. And we submit that the cases of Wells v. The City of Weston, and Boggs v. Caldwell County, are conclusive against the petitioners, whichever horn of the dilemma they may choose to hang upon.

2. The seventeenth subdivision of the declaration of rights provides that no law "retrospective in its operations can be passed." The act in question not only provides that the county shall pay one-fourth of the whole expense of the city police for all time to come, but the construction now sought to be put upon it makes it relate back to the first of January, 1864, and we are now asked to pay the expenses for the months of January and February ; unless this law is to be retrospective in its operations, we can in no event be required to pay any portion of any expenses incurred prior to the passage of the act ; indeed, it is modest enough to express, on its face, that it is to take effect upon its passage.

If the county is now forced to pay the seven thousand dollars demanded, it is not paying it as one-fourth of the expenses of the police, but it is refunding to the city what the city had lawfully paid of its own debt prior to the passage of the act. (R. C. 1855, p. 501 ; Sess. Acts, 1859, § 19, p. 448, sub. 4 ; id. § 20, 31 ; Cheaney v. Hoover, 9 B. Monroe, 330 ; Wells v. The City of Weston, 22 Mo. 385 ; Morford v. Unger, 8 Iowa, 93 ; Sedgwick on Stat. & Const. Law, 674 ; 2 Peters, 658 ; Dartmouth College v. Woodward, 4 Wheaton, 700, et seq. ; The State, ex rel. Soulter, v. Common Council of Madison, 15 Wis. ; Boggs v. Caldwell County, 28 Mo. 586 ; Mayor & Aldermen of Nashville v. Towns, 5 Sneed, 186.)

BÁTES, Judge, delivered the opinion of the court.

The General Assembly, by an act approved March 27th, 1861, "established within and for the city of St. Louis, a board of police, to be called the Police Commissioners of the city of St. Louis."

This board was charged with the duties within the city of St. Louis, to preserve the public peace, prevent crime and arrest offenders; protect the rights of persons and property; guard the public health; preserve order at every public election and all public meetings and places, and on all public occasions; prevent and remove nuisances in all streets, highways, waters and other places; provide a proper police force at every fire for the protection of firemen and property; protect emigrants and travellers at steamboat landings and railway stations; see that all laws relating to elections and to the observance of Sunday, and regulating pawnbrokers, gamblers, intemperance, lotteries and lottery policies, vagrants, disorderly persons, slaves and free negroes, and the public health, are enforced; and also all laws and ordinances of the city of St. Louis which may be properly enforceable by a police force.

To enable the board to perform these duties it was authorized to employ a permanent police force, the officers of which were designated by the act, and the pay of officers and ordinary policemen fixed by it. The board was authorized to provide such office and furniture and such clerks and subordinates as it might need, and to have and use a common seal, and to provide station houses and requisites for the same. It was also authorized in extraordinary emergencies to raise such additional force as the exigency may demand, and, for the preservation of the public peace and quiet, to require the sheriff of the county of St. Louis to act under their control, and, if ordered by them to do so, to summon the *posse comitatus*, and employ such *posse* subject to their direction. They were also authorized to call to their aid any military force, lawfully organized in the city,

and they were authorized to make arrests in any part of the State. The city of St. Louis was deprived of all control over the police. The commissioners were authorized to make requisitions upon the city of St. Louis, from time to time, for such sums of money as they might deem necessary for executing their duties, which the city was required to pay.

The General Assembly by another act, approved December 12, 1863, increased the pay of the policemen, and also provided for an increase of their number. This act also required the city of St. Louis to pay the requisitions of the commissioners for the additional expense and limited the whole amount of appropriations for police purposes to $175,-000.

The General Assembly by another act, approved February 5th, 1864, enacted as follows:

"Sec. 3. The county of St. Louis shall be chargeable with one-fourth of the whole expense of the police force of said city of St. Louis for the year 1864, and for each year thereafter; and the County Court of said county shall from time to time appropriate money out of the county treasury to meet that proportion of said expense; and whenever the said Board of Police Commissioners shall need money to meet the expenses of said police force, they shall make requisition upon said county for one-fourth, and upon said city for three-fourths thereof."

On the 18th day of February, 1864, the Police Commissioners made a requisition upon the county of St. Louis for seven thousand dollars, for one-fourth of the said police expenses for the months of January and February, in the year 1864, which the County Court refused to allow or to make any appropriation for. The Police Commissioners then applied to this court for a *mandamus*, commanding said County Court to pay said sum and make an appropriation therefor. A conditional *mandamus* having issued, the County Court made return to it, that

1. The act of February 5th, 1864, is in violation of common right and of the Constitution of the State, in that it appropriates private property without just compensation; that it is retrospective in its operation, and that it violates the principles of taxation as laid down in the Constitution.

2. There is no money in the county treasury that can legally be appropriated to pay the same, the money in the treasury having been raised by taxation prior to the passage of said act and for certain specific purposes set forth in the order for the assessment and levy of the taxes from which such funds were derived, and cannot be diverted from the purpose for which they were collected; that it would be necessary to levy a special tax to pay said police force, and no such special tax can be levied without first making application to the General Assembly for permission to do so.

3. The sum of money required is sought to be recovered and applied for the purpose of paying a debt already incurred by said Police Commissioners or the city of St. Louis prior to the passage of said act, and in so far said act is retrospective in its nature, and is inoperative and void.

4. It is not stated or shown to this court what the expense of said police force has been or will be for the year 1864, or that the city of St. Louis has made the appropriations contemplated by said act.

5. The expense of said police for the months of January and February, 1864, had already been paid in the manner provided by law at the time of the passage of said act, and of the issuing of said writ.

I. In respect to the first cause assigned, why a peremptory *mandamus* should not issue, that is, that the act of February 5th is repugnant to the Constitution,—it is said to violate the Constitution in three respects, which will be examined in the order in which they are stated. The first is, that it is an appropriation of private property without just compensation. I remark in the first place that the act does

not designate any particular fund (described by the source of its derivation or otherwise) which is made chargeable with this expense. It says that the county of St. Louis shall be chargeable with one-fourth of the expense of the police force of the city of St. Louis, and that the County Court shall appropriate money to pay it. It is therefore immaterial, in considering of the constitutional authority of the General Assembly to pass the act in question, to inquire how the county has acquired or may acquire the money necessary to make the payments required by the act. The money belongs to the county by virtue of acts of the General Assembly, and is expended under the direction of the same authority. Counties are subdivisions of the State, in which some of the powers of the State Government are exercised by local functionaries for local purposes, in this instance and generally the functionary being the County Court. The funds of the county are not strictly private property. They certainly do not belong to the citizens who may have contributed them. They are rather public property, the property of the State acquired from the people and the property in the county, and to be used and expended for the benefit of the same people and property. The General Assembly, having the legislative power of the State, determines to what local uses the county funds shall be applied. Its determination and direction may operate unwisely, harshly and unjustly, but that is no argument against its power to direct. It authorizes and causes the funds to be collected, and requires their expenditure for purposes which it determines to be of local interest and benefit, and its determination is final. The judiciary cannot review this determination of the legislative power; cannot inquire whether the Legislature, in directing an expenditure of county funds, judged correctly or not as to its being for the accomplishment of an object of interest or advantage to the inhabitants of the county. In the present case the Legislature has thought proper to direct that the county of St. Louis shall pay one-fourth of

the expenses of a police in the city of St. Louis, which is wholly within and forms a part of the county of St. Louis. This court cannot say that this is not a legitimate use of county funds, or that it is a taking or application of private property to public use without just compensation, and it certainly is not an application of property to private use, for the Police Commissioners are an agency of the State Government, and required to perform within a specified locality some of the most important duties of the government.

2d. The act is said to be retrospective in its operation, in that it requires the county to pay a proportion of the expense of the police force for the whole year 1864, when a portion of that year had elapsed at the time the act was passed, February 5th. No vested right is taken away or impaired by the act, nor does it impair the obligation of any contract. It simply directs the application to a particular purpose of funds collected by the authority of the Legislature, and over which the Legislature could exercise a power to direct their application within certain limits, which include the object of this act. The previous acts of the Legislature which provided the object for which county funds could be expended, were at all times subject to repeal or alteration, so as to appropriate the funds in a manner, or to objects different from those before provided. No rights had been vested under the previous acts which can be disturbed by this act. The act is not retrospective in its operation.

3d. The act does not violate the principles of taxation as laid down in the Constitution. This point is fully covered by the decision of this court in the case of Hamilton and Treat against the St. Louis County Court, 15 Mo. 3, which case is also of authority upon the other points decided. The case of Wells v. The City of Weston, 22 Mo. 384, merely decides that the General Assembly cannot authorize a municipal corporation to tax for its own local purposes lands lying beyond the limits of the corporation, and does not conflict with this case.

II. As to the second cause shown in the return, it is understood to mean, not that there is in fact no money in the treasury to pay this requisition, but that as a matter of law all the money which is in the treasury was collected for specific purposes from which they cannot be diverted. The specific purposes for which the money was collected were those heretofore directed by the Legislature, and this act being a a later expression of the will of the Legislature controls the subject, and, so far as it conflicts with previous acts, repeals them.

The county is not a private corporation, but an agency of the State Government, and though as a public corporation it holds property, such holding is subject to a large extent to the will of the Legislature. Whilst the Legislature cannot take away from a county its property, it has full power to direct the mode in which the property shall be used for the benefit of the county.

III. The third cause assigned is included in the previous allegation, that the act is retrospective in its operation.

IV. As to the fourth cause assigned, the act does not require that the commissioners shall show to the county at any one time what is, or will be the whole expense for a year, but only that the county shall from time to time make appropriations to pay the requisitions of the commissioners, thus showing an expectation that the requisitions will be made at several different times. Nor does the county's liability at all depend upon the fact, that the city has or has not paid its liability.

V. The fifth cause is based upon the same idea as the third, and has been considered as it was presented in the first.

No good cause having been shown why the county should not pay the requisition of the Police Commissioners, let the peremptory *mandamus* issue.

Judges Bay and Dryden concur.