LUCAS *v.* THE BOARD OF COMMISSIONERS OF TIPPECANOE COUNTY.

CONSTITUTIONAL LAW.—*Railroad.*—*Aid to Railroad by Taxation.*—*Acts of May 12th, 1869, and December 17th, 1872.*—By the act approved December 17th, 1872, railroad companies which had received aid from counties or townships by taxation were required to issue stock to the parties who had paid the taxes, to the amount by them respectively paid; and the act provided that the issue of stock to a tax-payer should operate to cancel *pro tanto* the stock held by any county or township under the provisions of the statute of May 12th, 1869. Where, pursuant to the act of May 12th, 1869, the board of commissioners of

a certain county had levied a tax in aid of a certain railroad company, and had subscribed and, with the proceeds of the tax, had paid for a certain number of shares of the capital stock of said company, and certificates of stock therefor had been issued to the county;

*Held*, (PETTIT and BUSKIRK, JJ., dissenting), that the act of December 17th, 1872, so far as it provides for divesting counties of stock already subscribed and paid for at the time of the passage of the act, is not unconstitutional.

SAME.—Acts of the legislature must be sustained by the courts, unless they are clearly and undoubtedly repugnant to the constitution.

OPINION OF COURT.—*How far Authority.*—The language used in an opinion is always to be restricted to the case before the court, and is authority only to that extent. The reasoning, illustrations, and references contained in the opinion of a court are not authority or precedent, but only the points arising in the particular case, and which are decided by the court.

From the Tippecanoe Circuit Court.

*J. R. Coffroth, H. W. Chase,* and *J. A. Wilstach,* for appellant.

*W. C. Wilson, J. H. Adams, Z. Baird, S. P. Baird, R. Jones,* and *T. B. Ward,* for appellee.

DOWNEY, C. J.—Under the act of the legislature of this State, entitled "an act to authorize aid to the construction of railroads by counties and townships taking stock in, and making donations to railroad companies," approved May 12th, 1869, Acts 1869, p. 92, and in alleged conformity to that act, a tax was voted and collected in Tippecanoe county in aid of the Lafayette, Muncie, and Bloomington Railroad Company; and during the years 1871, 1872, and 1873, the commissioners of the county subscribed and paid for stock in said company to the amount of six thousand six hundred and ten shares, of the par value of fifty dollars per share, and the company issued to the county certificates of stock therefor. After the passage and approval of the act of December 17th, 1872, entitled "an act to require railroad companies to issue stock paid for by taxes voted in aid of the construction of their railroads, to the tax-payers or their assigns, and to issue unclaimed stock for the benefit of the common school fund, and declaring an emergency," and before the treasurer had issued to any person a certificate, such as is contemplated by the first section of said act, the commissioners requested the treasurer not to issue any such certificate

unless under the direction of the proper court. The treasurer disregarded this request and issued a number of such certificates to different persons, and threatened to continue to issue such certificates to all persons who might apply for them, and who could show themselves entitled to demand the same under said last mentioned act.

Upon a complaint by the commissioners against the treasurer, representing substantially the above facts, an injunction was granted by the judge of the circuit court, enjoining the treasurer from issuing any certificate or certificates to any person or persons, such as he is required to issue to tax-payers by the act of December 17th, 1872, the injunction to remain in force until the next term of the Tippecanoe Circuit Court, and until the further order of the court.

From this order of the court the treasurer appealed to this court, and he has assigned as error the granting of the injunction. In the first section of the act of December 17th, 1872, it is enacted that in all cases where stock has been taken by counties or townships in railroad companies, and paid for from taxes levied and collected under the provisions of the act of May 12th, 1869, it shall be the duty of the treasurer of the proper county, upon request, if made prior to the 1st day of January, 1874, to issue to the several tax-payers, and to the personal representatives of such as may have died, a certificate, stating the amount of railroad tax paid by such tax-payer, the date of payment, and the name of the railroad company in aid of which the tax was levied and paid, as the facts shall appear from the proper tax duplicates and record in his office.

In the second section it is provided, that where taxes have been, or shall be levied, in accordance with the provisions of said act, which shall thereafter be paid, the treasurer of the proper county shall give to the person paying any such railroad tax a special receipt therefor, in which the facts shall be stated as in case of a certificate being given as required in the preceding section.

The third section declares that the certificates and receipts,

Lucas *v.* The Board of Commissioners of Tippecanoe Co.

provided for in the first and second sections of the act, shall be assignable in writing, and any lawful holder thereof may present and surrender said certificate at any time prior to January 1st, 1874, and may present and surrender the said receipts to the proper railroad company, at any time within four years after the tax for which they were given was paid, in sums equal in amount to any number of shares in the capital stock of such company; and it shall be the duty of such company to issue a certificate of paid up capital stock therein to the amount of the certificates and receipts so surrendered: Provided, that the company shall not be compelled to issue such certificates of stock to an amount greater than the money it shall have received from the county or township, as the case may be, together with the expenses of the election to be paid by any such railroad company under the provisions of the ninteenth section of the act of May 12th, 1869: Provided, that the stock so issued under the provisions of this act being involuntary in its character, no personal liability shall attach to the original holder thereof for any debt contracted by the railroad company.

By the fourth section it is made the duty of the auditors of the several counties in which railroad taxes may have been collected and paid over for stock, under the provision of the act of May 12th, 1869, immediately after the expiration of the time for the surrender of certificates and receipts by individuals to railroad companies, as fixed in the preceding section, to ascertain from the books of the county treasurer and the books of the proper railroad company, which he shall have the right to examine for that purpose, what amount of stock has been paid for by taxes levied in the county, or any township, as the case may be, which has not been applied for by individuals upon the surrender of such certificates and receipts as aforesaid, within the times limited for that purpose, and for such amounts of unclaimed stock, the proper railroad company shall, upon the request of such auditor, issue to the several civil townships in such county

certificates of stock in proportion, as nearly as may be, to the number of children in such townships between the ages of six and twenty-one years, as shown by the last preceding enumeration for school purposes; which stock, with all dividends thereon, shall be for the use of the public schools of such townships, and be a part of the school fund of such township : Provided, that if such unclaimed stock shall have been purchased by tax voted in one or more townships, and not in the whole county, the township or townships in which the same was paid shall alone be entitled to said unclaimed stock to be apportioned, in case of more than one township, in manner aforesaid, upon the basis of the number of children between the said ages of six and twenty-one years. According to the fifth section, the issuing of stock to individuals or townships for school purposes by railroad companies, as provided for in this act, shall operate to cancel, *pro tanto*, the stock held by any county or township under the provisions of the act of May 12th, 1869; and all stock standing in the name of any township or county shall be the property of the individuals paying therefor, and of the several townships for school purposes, as the case may be, after individuals entitled thereto shall fail to apply therefor during the time above limited for that purpose.

By the sixth section, townships are authorized to vote the stock held by their respective townships in all meetings of stockholders of the companies, by which the stock was issued; and all stock held under the provisions of this act shall entitle the holders thereof to all the rights and privileges of stockholders, who may have personally subscribed and paid stock in such railroad companies. The last section declares that an emergency exists for the immediate taking effect of the act, and that the same shall be in force and take effect from and after its passage.

The question presented is as to the constitutionality of the act which we have set out, the act of December 17th, 1872. It is urged by counsel for the appellees that the legislature has not the power to pass a law to take the railroad stock

from the county, after it has been subscribed and paid for by the county out of the fund raised by taxations, and transfer it to those from whom the money was collected, and in the event that they do not apply for it, to vest it in the townships for school purposes. Only so much of the act as attempts to divest counties and townships of stock already subscribed and paid for at the passage of the act is brought in question in this case. So much of it as relates to stock subscribed or to be subscribed after the passage of the act is not in question. Counsel raise no question as to the form of the action, the manner in which the question is presented, or as to the parties to the action. The constitutionality of the act in its application to the facts of this case is the only question discussed or presented.

Were this a question relating to the power of the legislature to dispose of the property of a private corporation, as it has disposed or attempted to dispose of the property of the counties and townships by this law, there would, probably, be no ground for hesitation in declaring the law to be a violation of the constitution. Counties and townships, however, are not private corporations, and the rules of law applicable to them are not, in all respects, the same as those which are applicable to private corporations. They are not created by special charter, as is generally or frequently the case with private corporations. They exist under general laws enacted by the legislature, by which the territory of the State is divided into political divisions, as the convenience of the government may suggest and require; and the people falling within such divisions have such rights, are required to perform such duties, and conform to such regulations as may be prescribed. This makes it convenient, if not necessary, that corporate powers, greater or less in extent, shall be conferred upon them. Whether they shall have those rights, assume those duties, or conform to those regulations, they are not allowed to determine. The legislature creates the divisions, either directly or by conferring power for that purpose upon some

court or tribunal. When thus created, they are required to perform the duties and to submit to the burdens imposed by the legislature, or by the court or tribunal upon whom authority for such purpose may be conferred by the legislature. Their functions are of a public nature, designed for local self-government, and there is, therefore, no room, as there may be in case of private corporations, to imply any contract between them and the State in their organization as corporate bodies, except such as may arise from ordinary considerations of good faith. Hence, when there is no constitutional prohibition, the legislature may, at its pleasure and as the exigencies of the case may suggest or require, change the boundaries of counties and townships, alter or change the law relating to them, and may even abolish entirely such corporations, either directly, or by conferring the power to do so upon some court or tribunal designated for that purpose.

But the question here is, can the legislature, while such a corporation remains in existence, take from it property which has been thus vested in it by authority of law, and transfer the ownership to another? It may be stated as a general proposition, that the property owned by counties and townships is derived or results from the taxation of the property and polls of the county or township. There are exceptions to this rule; for instances could be named where property is acquired by such corporations by means other than taxation. In this instance, however, the money with which the railroad stock was purchased was obtained from the people of the county by taxation exclusively, and the object of the law in question is to return to them, so far as is practicable, the property in its new form, in the same proportions in which it was obtained from them. Assuming that the stock, if the county shall continue to own and hold it, will yield a revenue to the county treasury, it may be presumed that, to this extent, the taxes which it may be necessary, in the future, to levy for county purposes, will be diminished, and that, therefore, to most of those who have paid the money, it will make no material difference whether

the county shall hold the stock, or those who paid the money with which it was purchased.   But as taxation in the future must necessarily be different from what it was when the money was collected, on account of changes of residence, transfers of property by sale, by death, etc., the difference between the two modes of ownership of the property is quite apparent.   And then, what may be of some moment, the right to represent the stock in voting at elections, by which the management of the affairs of the railroad company may be controlled, may be of considerable interest and importance.   Whether this power shall be given to the commissioners or vested in those who furnished the money with which the stock was purchased, may be very important.   It has been said by an eminent modern law writer, that the legislative power of the state controls and disposes of the property of the state.   How far it can also dispose of that of those agencies of government which it has created and endowed with corporate powers, is a question which happily there has been very little occasion to discuss in the courts.   Being a mere agency of government, it is evident that the municipality cannot itself have that complete and absolute control and power of disposition of its property which is possessed by individuals over their own.   For it can hold and own property only for corporate purposes, and these purposes are liable at any time to be so modified by legislation as to render the property no longer available. Moreover, the chartered rights may be altogether taken away, and in that case the legislature has deprived the corporation of its property by depriving it of corporate capacity to hold it.   And in many ways in which the corporation holds and enjoys property, the legislature must possess power to interfere with its control at least incidentally; for the mere fact that the corporation possesses property can not deprive the State of its complete authority to mould and change the corporate organization and enlarge or diminish its powers, which it possessed before.   But whether the State can directly intervene and take away the corporate property, or

convert it to other uses than those for which it was pro-
cured, or whether, on repealing a charter of incorporation, it
can take to itself the corporate property and dispose of it
at its discretion, are different questions from any raised by the
indirect and incidental interference referred to. Cooley Const.
Lim. 235.

When the municipal divisions of the territory of the State
are changed in their boundaries, two or more consolidated
into one, or one is subdivided, the legislature possesses the
power to make such disposition of the corporate property
as equity and justice may require, in view of the changes
made.    Cooley Const. Lim. 236; *The State* v. *Votaw*, 8
Blackf. 2 ; *Love* v. *Schenck*, 12 Iredell, 304; *The Town
of Milwaukee* v. *The City of Milwaukee*, 12 Wis. 93.

Judge COOLEY, in the summing up of his views on the
question as to the power of the legislature over the prop-
erty of municipal corporations, says, that the rule upon
the subject seems to be this : when corporate powers
are conferred, there is an implied compact between the
State and the corporators that the property which they
have the capacity to acquire under their charter shall
not be taken from them and appropriated to other
uses.   If the State grants property to the corporation, the
grant is an executed contract, which cannot be revoked.
The rights acquired, either by such grants or by any other
legitimate mode in which such a corporation can acquire
property, are vested rights, and cannot be taken away.
Nevertheless, when the corporate powers are repealed, the
corporate ownership ceases; and by modification of corpo-
rate powers, the legislature may in other cases affect and
divest the rights of individual corporators, so far as they
can be said to have any rights in public property.   And in
other ways and by direct intervention, the legislature may
exercise control over the disposition and use of property,
subject to the restriction, that it must not be diverted to a
use substantially different from that for which it was acquired.
Page 238.

The case of *Darlington* v. *The Mayor, etc., of New York*, 31 N. Y. 164, was an action under a statute of that state against the city, to recover the value of certain personal property which had been destroyed in consequence of a riot, and the questions to be decided were as to the constitutionality of the law and the power of the legislature to make the property of the city liable to the payment of the judgment in such case. The law was held constitutional, and it was held that the legislature had the power to render the property of the city liable to such judgments as judgments recovered for any other cause of action, and also that the property owned by the city corporation was held by it as a public corporation, and was subject to the law making power of the state vested in the legislature. DENIO, C. J., in delivering the opinion of the court, said:

"City corporations are emanations of the supreme law making power of the State, and they are established for the more convenient government of the people within their limits. In this respect, corporations chartered by the crown of England and confirmed at the revolution, stand on the same footing with similar corporations created by the legislature. Their boards of aldermen and councilmen and other officers are as truly public officers as the boards of supervisors, or sheriffs and clerks of counties; and the property intrusted to their care and management is as essentially public property as that confided to the administration of similar official agencies in counties and towns. In cities, for reasons partly technical, and in fact founded upon motives of convenience, the title is vested in the corporate body. It is not thereby shielded from the control of the legislature, as the supreme law making power of the State. Let us suppose the city to be the owner of a parcel of land not adapted to any municipal use, but valuable only for sale to private persons for building purposes, or the like. No one, I think, can doubt but what it would be competent for the legislature to direct it to be sold, and the proceeds to be devoted to some municipal or other public purpose, within the city, as a court-house, a

hospital, or the like; and yet, if the argument on behalf of the defendants is sound, it would be the taking of private property for public use without compensation, and the act would be void." And again the learned judge says: "The vice of the argument of the defendant is, that it assimilates the condition of the city, in respect to the property to which it has title, to that of an individual or a private corporation, and denies to the legislature any power over it which it would not possess over the fortunes of a private citizen."

In *The State of Maryland* v. *The Baltimore and Ohio Railroad Company*, 3 How. 534, the validity of an act of the legislature of Maryland was in question. The state, in 1836, passed a law directing a subscription of three millions to be made to the capital stock of the Baltimore and Ohio Railroad Company, with a proviso that if the company should not locate the road in the manner provided for in the act, they should forfeit one million dollars to the State of Maryland for the use of Washington county. In March, 1841, the state passed another act repealing so much of the prior act as made it the duty of the company to construct the road by the route then prescribed, remitting and releasing the penalty, and directing the discontinuance of any suit brought to recover the same. It was adjudged that the proviso was a measure of state policy, which it had a right to change, if the policy was afterward discovered to be erroneous, and neither the commissioners, nor the county, nor any one of its citizens acquired any separate or private interest under it, which could be maintained in a court of justice. It was held to be a penalty inflicted upon the company as a punishment for disobeying the law; and the assent of the company to it, or a supplemental charter, was not sufficient to deprive it of the character of a penalty; that being a penalty imposed by law, the legislature had a right to remit it.

*East Hartford* v. *The Hartford Bridge Co.*, 10 How. 511, is also cited. The town of Hartford owned a ferry over the Connecticut river from 1681 to 1783, at which time the legislature incorporated the town of East Hartford and

granted to it one-half of the ferry during the pleasure of the general assembly. In 1808, a company was incorporated to build a bridge across the river, which being erected was injured and rebuilt in 1818, when the legislature resolved that the ferry should be discontinued. It was urged that this last act of the legislature was in violation of the clause of the constitution of the United States which forbids the states from passing any law impairing the obligation of contracts. But it was held that the public character of all the parties to the grant, no less than its subject-matter, showed that nothing in the nature of a contract existed in the case, so as to prevent subsequent interference with the matter by the legislature, as the public interest might seem to require. It was also held that the town of East Hartford held the ferry right only during the pleasure of the general assembly.

In *The County of Richland* v. *The County of Lawrence,* 12 Ill. 1, the question was this: Under a statute relating to internal improvements, a certain sum of money had been paid to Lawrence county, as one of the counties that had by the law no railroad or canal passing through it. Richland county was created by detaching territory from Lawrence and Clay counties. After the county of Richland was created, the legislature passed a law directing that Lawrence county should pay out of the fund so received, to Richland county, such proportion of the fund as the population of Richland county, or that part of the territory taken from Lawrence county, as compared with the whole population, should show Richland county entitled to. It was urged that the statute making such division was in violation of the clause in the constitution of the United States forbidding the passage of any law by a state impairing the obligation of contracts. But it was held that the statute was not liable to the objection. TRUMBULL, J., in delivering the opinion of the court, used this language:

"The money in this instance was appropriated out of the funds received by the State for purposes of internal improve-

ment, and was directed to be drawn and expended by the county officers in a particular manner. Before its expenditure, we cannot doubt that the legislature had entire control over the fund, either to resume it altogether, or to change the purposes for which it was originally designed to be expended. There was no contract here between the State and Lawrence county, either at the time the appropriation was made, or when the county received the money. The county was the mere agent of the State for the disbursement of a certain amount of the money of the State as she directed." The money was by the act to be expended in the improvement of roads, construction of bridges, and other public works. The judge proceeds: "That the State may make a contract with, or grant to a public municipal corporation, which it could not subsequently impair or resume, is not denied; but in such case, the corporation is to be regarded as a private company. A grant may be made to a public corporation for purposes of private advantage, and although the public may also derive a common benefit therefrom, yet the corporation stands on the same footing as respects such grant, as would any body of persons upon whom like privileges were conferred.

"Public or municipal corporations, however, which exist only for public purposes, and possess no powers except such as are bestowed upon them for public, political purposes, are subject at all times to the control of the legislature, which may alter, modify, or abolish them at pleasure." 2 Kent Com. 305 ; *Bailey* v. *The City of New York,* 3 Hill N. Y. 531."

In *Dennis* v. *Maynard,* 15 Ill. 477, the question was as to the validity of a law by which a tax was imposed, to pay a debt incurred in the erection of a bridge, and to keep the bridge in repair, in a certain precinct. It was objected that the act was judicial and not legislative. The act was held valid. The court said, SCATES, J., delivering the opinion: "The State does not allow itself to be sued, but it may hear, investigate, and determine its own indebtedness, and

assume the debts due to or from others.   So it may direct
the county authorities to ascertain and allow just claims
upon the public treasury, or may ascertain and fix that
amount and direct the raising of means, by taxation, for its
payment.   The public, county, and township funds are under
legislative control, and so decided in *The County of Pike* v.
*The State*, 11 Ill. 202; and *The County of Richland* v. *The
County of Lawrence*, 12 Ill. 1.    These local municipal
corporations are created for convenience in the police arrange-
ments, but their powers and duties remain subject to the
public will, through the legislative body.   Under these views
and principles, we perceive no objection interposed by the
constitution, or of private or vested rights, to a legislative
direction to refund moneys advanced for the public use; or
to the purchase of private property for their accommodation.
I am speaking of the question of legislative power, and as
to this, I can perceive no lack, in their direction even, to levy
a tax for the part as well as the whole bridge."

In *The State, ex rel., etc.,* v. *The County Court, etc.,* 34 Mo.
546, an act of the legislature was in question, which directed
the appropriation of a large sum of money, which had been
raised by taxation by the county, to pay a portion of the
police expenses of a city within its limits.   The act was held
valid.   BATES, J., said:

"The money belongs to the county by virtue of acts of
the General Assembly, and is expended under the direction
of the same authority.   Counties are subdivisions of the
State, in which some of the powers of the state government
are exercised by local functionaries for local purposes, in
this instance and generally the functionary being the county
court.   The funds of the county are not strictly private
property.   They certainly do not belong to the citizens who
may have contributed them.   They are rather public prop-
erty, the property of the State acquired from the people and
the property in the county, and to be used and expended for
the benefit of the same people and property.   The General
Assembly, having the legislative power of the State, deter-

mines to what local uses the county funds shall be applied. Its determination and direction may operate unwisely, harshly and unjustly, but that is no argument against its power to direct. It authorizes and causes the funds to be collected, and requires their expenditure for purposes which it determines to be of local interest and benefit, and its determination is final. The judiciary cannot review this determination of the legislative power ; cannot inquire whether the legislature, in directing an expenditure of county funds, judged correctly or not as to its being for the accomplishment of an object of interest or advantage to the inhabitants of the county. In the present case, the legislature has thought proper to direct that the county of St. Louis shall pay one-fourth of the expenses of a police in the city of of St. Louis, which is wholly within and forms a part of the county of St. Louis. This court cannot say that this is not a legitimate use of county funds, or that it is a taking or application of private property to public use without just compensation, and it certainly is not an application of property to private use, for the police commissioners are an agency of the state government, and required to perform within a specified locality some of the most important duties of the government." Further on, in disposing of another point made in the case, the learned judge says : "The county is not a private corporation, but an agency of the state government and though as a public corporation it holds property, such holding is subject, to a large extent, to the will of the legislature. Whilst the legislature cannot take away from a county its property, it has full power to direct the mode in which the property shall be used for the benefit of the county."

The case of *Grim* v. *Weissenberg School District*, 57 Pa. St. 433, involved the validity of a law for the collection of assessments on persons and property to pay bounties. Grim paid his taxes under protest, and afterward sued to recover the amount back. While the suit was pending, an act was passed curing certain defects in the assessment. This law was also

Lucas *v.* The Board of Commissioners of Tippecanoe Co.

in question. The court held the acts valid, and that Grim was not entitled to recover. SHARSWOOD, J., among other things, said: "The legislature cannot impair the obligation of a contract, or pass an *ex post facto* law, for both these are expressly forbidden. Retrospective laws and state laws divesting vested rights, unless *ex post facto* or impairing the obligation of contracts, do not fall within the prohibition contained in the constitution of the United States, however repugnant they may be to the principles of sound legislation."

In *The Town of Milwaukee* v. *The City of Milwaukee*, 12 Wis. 93, it was decided that the legislature had not the power, either directly or indirectly, to divest a municipal corporation of its private property, without the consent of its inhabitants.

*City of Louisville* v. *The President, etc., of the University of Louisville*, 15 B. Mon. 642, involved the question to what extent the legislature could control the property rights of the city. It was said: "The city of Louisville, though itself a civil institution created to be employed to some extent as an instrument of the government, was not and is not the government itself, but a distinct though subordinate being; and although, as a public corporation, it holds its existence and its peculiar forms and faculties at the will of the government of which it is an instrument, or in some sense a part, it is not so identified with it that all its acts and acquisitions must necessarily be ascribed to the government, or enure to its benefit, either in point of interest or of power. Louisville might hold property for herself and her corporators. She might contract with individuals or other corporations with respect to her peculiar interests, and might certainly contract with the State; and even if abolished as a corporation, the State would not thereby become the beneficial proprietor of her rights of property or contract, but these would remain subject to the uses for which she had lawfully acquired or appropriated them."

In *The State, ex rel. Board of Education of Oshkosh*, v. *Haben*, 22 Wis. 660, it was decided that money raised in a city by

taxation, for the purpose of erecting a high school building, could not be lawfully diverted by an act of the legislature, without the assent of the city or its inhabitants, to the purchase of a site for a normal school in the same city.

After land had been taken for a road and paid for by the public, it was held that it could not, by act of the legislature, be taken from the public and donated to the former owner, without any consideration paid therefor; when the town authorities had taken the land for the purpose of a highway and paid the proprietor therefor, the right to the easement became a vested right in the public, and the public having received the land, and the proprietor the compensation, it became a fixed contract between them, and the provision of the constitution of the United States declaring that "no state shall pass any law impairing the obligation of contracts" applied. *The People* v. *The Commissioners of Highways, etc.*, 53 Barb. 70.

Whether counties stand on an equality with cities and towns, as corporations, may be doubtful. If they do not, then the cases cited, in which cities and towns were the corporations whose rights and powers were in question, would not be strictly applicable to the case which we are considering.

Judge STORY says: "There is no doubt, as to public corporations, which exist only for public purposes, that the legislature may change, modify, enlarge, and restrain them; with this limitation, however, that property, held by such corporation, shall still be secured for the use of those for whom, and at whose expense, it has been acquired." 2 Story Const., sec. 1393. The same language, in substance, was used by the same learned judge in *Terrett* v. *Taylor,* 9 Cranch, 43; and this language was referred to in *Edwards* v. *Jagers,* 19 Ind. 407. But neither of these cases involved the question concerning the powers of the legislature over the property of a county or any other municipal corporation; as the case in Cranch related to the property of an ecclesiastical corporation, and that in 19 Ind. related to a private corpora-

tion for educational purposes. The Dartmouth College case, 4 Wheat. 518, is also referred to. That, however, was a case, as nearly every lawyer knows, concerning a corporation for educational purposes, and the case was decided on the ground that the charter was so much in the nature of a contract that it could not be altered by the legislature. The court, therefore, could have decided nothing relating to municipal corporations. It may be well to state, in view of these authorities and as applicable to all cases decided by any court, that the language used in an opinion is always to be restricted to the case before the court, and the decision is only.authority to that extent. The reasoning, illustrations, and references contained in the opinion of a court are not authority, not precedent, but only the points arising in the particular case, and which are decided by the court. The members of a court often agree in a decision, but differ decidedly as to the reasons or principles by which their minds have been led to a common conclusion. It is therefore the conclusion only, and not the process by which it has been reached, which is the decision of the court, and which has the force of precedent in other cases. The reasoning adopted, the analogies and illustrations presented, in real or supposed cases, in an opinion, may be used as argument in other cases, but not as authority. In these the whole court may concur or they may not. So of the principle concurred in and laid down as governing the point in judgment, so far as it goes or seems to go beyond the case under consideration. If this were not so, the writer of an opinion would be under the necessity in each case, though his mind is concentrated upon the case in hand, and the principles announced directed to that, to protract and uselessly encumber his opinion with all the restrictions, exceptions, limitations, and qualifications, which every variety of facts and change of phase in causes might render necessary. _Louisville, etc., R. R. Co._ v. _The County Court, etc._, 1 Sneed, 637.

Of all the cases cited on both sides of this case, and we have examined them all, there is not one exactly like this

one. The principles enumerated in the cases and by the authorities cited are so at variance that we are little better prepared to decide the case than when we commenced the examination of the authorities. It being conceded that the legislature may change, modify, enlarge, or wholly abolish public municipal corporations, when not restrained by constitutional provisions, it is not easy to fix the exact limits, if there be such limits, to the legislative power over the property of such corporations. None of the authorities to which we have referred deny the power over the property of such corporations, but most of them hold, to use the language of Judge STORY, "that property held by such corporation shall still be secured for the use of those for whom and at whose expense it has been acquired." Who is to decide whether the new use to which the property is applied by the legislature is in violation of this restriction or not? Judge BATES, in *The State* v. *St. Louis Co. Court, supra,* says: "The general assembly, having the legislative power of the State, determines to what local uses the county funds shall be applied. Its determination and direction may operate unwisely, harshly and unjustly, but that is no argument against its power to direct. It authorizes and causes the funds to be collected, and requires their expenditure for purposes which it determines to be of local interest and benefit, and its determination is final. The judiciary cannot review this determination of the legislative power; cannot inquire whether the legislature, in directing an expenditure of county funds, judged correctly or not as to its being for the accomplishment of an object of interest or advantage to the inhabitants of the county."

Can anything be urged against the justice of this law? The money with which the stock was purchased was paid by all the tax-payers of the county. The law proposes to return it to them, in the same proportions, in its new form, or if they do not apply for it, to vest it in the township for school purposes, a purpose clearly of a public nature. He who paid most is to own most. No provision could be more

Lucas *v.* The Board of Commissioners of Tippecanoe Co.

just and equitable. It would, in some respects, operate unjustly, to retain the stock as a county fund, to very many who had paid the money with which it was purchased. The population of a county is constantly fluctuating. One man who had paid a large part of the tax removes, and another who had paid none comes into the county; in which case, the one who had contributed nothing would have all the advantages of the stock or fund, which might relieve him from county taxes, and would also have the use of the road which was built by it, and the other, who had paid for the benefit, would be entirely deprived of it. The distribution of the stock avoids this injustice, as the tax-payer receives a share of the stock equal to the amount of money paid by him which, as his personal property, he may carry with him wherever he may go. See *Louisville, etc., Railroad Co.* v. *The County Court of Davidson Co., supra.*

It is expressly decided in this case, that where there was a provision in the act by which the tax was authorized and the stock subscribed, directing the issuing of stock to those who paid the tax, in the proportions in which they contrib- .uted the money with which it was purchased, such provision was valid, and not liable to any constitutional objection. The part of the act in question in that case, relating to the distribution of the stock among those paying the taxes, is very much like the act in question in this case, except that it is contained in the act authorizing the tax and the subscription, while this act was passed after the tax had been voted and collected, and the stock subscribed.

It should be stated as a fact which may have a material bearing on the question in this case, that the act of May 12th, 1869, does not provide how the stock to be subscribed for by a county shall be held, how it shall be managed, or to what purpose it or its dividends shall be applied. The legislature, apparently by design, omitted to make any specific appropriation of the stock or its dividends to any purpose. The way is, therefore, left open to a further act declaring what shall be done with the stock, etc., and to what

uses or purposes it shall be applied. The constitutionality of the act of May 12th, 1869, under which the tax was collected and the stock taken, is maintained, upon the theory that the railroad in aid of which the money is to be appropriated is a work of public utility, to be constructed for the public good. The primary object is to aid in the construction of the railroad. The title to the act and the act itself clearly indicate this. The tax, when collected, does not go into the county treasury as such. It does not become the property of the county. It is collected for a specific purpose, and the county officers are appointed to collect and finally devote the money to the purpose for which it is raised The commissioners may take stock in the railroad company in the name of the county, or donate the money to the company "for the purpose of aiding in the construction of such railroad." The tax could not be collected for the mere purpose of taking the stock. But it might be for the purpose of aiding in the construction of the railroad; and as a mode of appropriating the money, the county commissioners are authorized to take stock in the name of the county, and pay the money over to the company. It does not thereby become the property of the county, in the sense that it would if purchased with county funds, and the primary object was the purchase of the stock for its own use. We do not think the right of the county to the stock thus taken is of such a character as to prevent the State from providing that it shall be transferred and issued to those who paid the money with which it was bought. It is equitably theirs. Their money bought and paid for it. It is true that under the law the stock is taken in the name of the county, but, as before stated, that is only the mode of appropriating the money to aid in the construction of the railroad. It is not to fix the ultimate right to the stock. If the law had provided that the stock should be taken in the name of the sheriff of the county, the intention that the person selected as the holder of the stock was simply a matter of convenience would, perhaps, at first, be a little more apparent than

Lucas *v.* The Board of Commissioners of Tippecanoe Co.

now.   Still, a little reflection will show that there would not in fact be any real difference.   If the commissioners concluded to take stock, it would be necessary that it should be taken in the name of some person, but, in our opinion, subject to any future legal disposition by the legislature.   It has always been the language of this court, with reference to the constitutionality of acts of the legislature, that they must be sustained, unless they are clearly and undoubtedly repugnant to the constitution.   We have not found any such repugnancy between the act in question in this case and the constitution of the United States or of this State, as in our opinion should render it invalid.   We must therefore hold the judgment of the circuit court, enjoining the treasurer of the county from issuing certificates as required by the act, to be erroneous.

The judgment is reversed, with costs, and the cause remanded, with instructions to dismiss the complaint.

BUSKIRK and PETTIT, JJ., being unable to concur in the opinion and judgment pronounced by a majority of the court, dissent therefrom and state the following reasons for their dissent:

The facts of the case and the questions of law arising in the record sufficiently appear in the opinion of the majority of the court, and need not be re-stated.   The cause was tried before Judge Vinton, who delivered a very able and exhaustive opinion in reference to the constitutionality of the law in question.   We fully concur in the views expressed by the learned judge, and make his opinion a part of this dissenting opinion, and which is as follows:

This is a complaint for an injunction.   I am asked to enjoin the defendant, as the treasurer of said county, from issuing such certificates as are contemplated by an act entitled  " an act to require railroad companies to issue stock paid for by taxes voted in aid of the construction of their railroads, to the tax-payers or their assigns, and to issue

unclaimed stock for the benefit of the common school fund," etc., approved December 17th, 1872, on the sole ground that said act is unconstitutional and void.   The complaint, in my judgment, fully presents the point above indicated, and I am compelled in the discharge of my official duty to adjudge it.   I am aware that even courts of the highest character for learning, integrity, and ability have ever approached questions involving the validity of legislative enactments, impressed with a sense of deep responsibility.   A judicial question of greater gravity or more serious import cannot arise under our system of government.

I am not, I trust, insensible to the importance of the questions, and the magnitude of the interests, involved in this case.

I have given the subject the best examination I could in the time allowed me.   If, in the conclusion to which I have arrived, I have erred, I am glad to know that the error can be speedily and effectually remedied by a higher court.   I have done the best I could, and that, as I understand it, embraces my whole official duty.

Since the only question before me is one of constitutional power, it is manifest that a discussion of the fitness or unfitness of the members of the board of commissioners for the positions they hold is wholly out of place.   Nor can the justice or injustice, policy or impolicy, of the act in question, have any thing to do with the solution of the question.

The question under consideration arises as follows:

In 1869 the legislature passed an act authorizing aid to the construction of railroads, by counties and townships taking stock in, and making donations to, railroad companies.   Under this act, such steps were taken as resulted in a submission of the matter, whether a railroad appropriation should or should not be made in aid of the Lafayette, Muncie, and Bloomington Railroad Company, to a vote of the people of this county, which resulted in favor of such appropriation.

Lucas *v.* The Board of Commissioners of Tippecanoe Co.

Thereafter the board of commissioners levied the tax as provided in section 12 of said act.

Section 14 of said act provides, that "said board of commissioners may, after the assessment herein provided for, or any part thereof, shall have been collected, take stock in such railroad company, from time to time, in the name of the proper county or township, as the case may be, and pay therefor, when the same is taken, out of the moneys so collected as aforesaid, or they may donate such moneys to such company, for the purpose of aiding in the construction of such railroad, and pay the same over, from time to time, as the work progresses, as hereinafter provided.

As the taxes thus levied were collected from time to time and during the years 1871, 1872, and 1873, the board of commissioners subscribed and paid for stock in the Lafayette, Muncie, and Bloomington Railroad Company, a railroad corporation duly organized under the laws of this State. At the times such subscriptions and payments were made, said railroad company issued its stock certificates to the board of commissioners for six thousand six hundred and ten shares of stock, of the par value of fifty dollars per share.

It is claimed by the plaintiff's counsel that this stock became and is the property of the county, and that her beneficial ownership cannot be taken away and given to private citizens for private purposes, as is attempted to be done by the act of December 17th, 1872, above referred to.

It is admitted on all sides that the plaintiff is a corporation.

Corporations are of various kinds, but the only division that need be referred to in this discussion is that of public and private corporations.

As to the latter kind, the law is well settled by a long line of decisions, commencing with the celebrated Dartmouth College case, that their rights, privileges, and franchises are protected from legislative interference by that clause of the

federal constitution which forbids a state from passing "any law impairing the obligation of contracts."

It is also well settled that a strictly public corporation (whatever that may be under the authorities) is wholly subject to the legislative control, except as to certain limitations as to proprietary rights.

In the case of *Terrett* v. *Taylor*, 9 Cranch, 52, Mr. Justice STORY, in the only opinion delivered, uses this language: "In respect, also, to public corporations which exist only for public purposes, such as counties, towns, cities, etc., the legislature may, under proper limitations, have a right to change, modify, enlarge or restrain them, securing, however, the property for the uses of those for whom and at whose expense it was originally purchased."

Again, in the Dartmouth College case, 4 Wheaton, at page 663, Mr. Justice WASHINGTON, says: "But the case of *Terrett* v. *Taylor*, 9 Cranch, 43, fully supports the distinction above stated, between civil and private corporations, and is entirely in point. It was decided in that case, that a private corporation, created by the legislature, may lose its franchise by misuser, or non-user, and may be resumed by the government under a judicial judgment of forfeiture. In respect to public corporations which exist only for public purposes, such as towns, cities, etc., the legislature may, under proper limitations, change, modify, enlarge, or restrain them, securing, however, the property for the use of those for whom, and at whose expense, it was purchased."

In the same case, at pages 694 and 695, Judge STORY says:

"It may also be admitted, that corporations for mere public government, such as towns, cities and counties, may in many respects be subject to legislative control. But it will hardly be contended, that even in respect to such corporations, the legislative power is so transcendent, that it may at its will take away the private property of the corporation, or change the uses of its private funds acquired under the

public faith. Can the legislature confiscate to its own use the private funds which a municipal corporation holds under its charter, without any default or consent of the corporators? If a municipal corporation be capable of holding devises and legacies to charitable uses (as many municipal corporations are), does the legislature, under our forms of limited government, possess the authority to seize upon those funds, and appropriate them to other uses, at its own arbitrary pleasure, against the will of the donors and donees? From the very nature of our governments, the public faith is pledged the other way; and that pledge constitutes a valid compact; and that compact is subject only to judicial inquiry, construction, and abrogation. This court have already had occasion, in other causes, to express their opinion on this subject; and there is not the slightest inclination to retract it."

The limitation of the legislative power, as expressed by Judge STORY, has been generally received and quoted as the true rule upon the subject. Thus, Chancellor KENT, in the second volume of his commentaries, at page 305, declares: "In respect to public or municipal corporations, which exist only for public purposes, as counties, cities, and towns, the legislature, under proper limitations, have a right to change, modify, enlarge, restrain, or destroy them; securing, however, the property for the uses of those for whom it was purchased. A public corporation, instituted for purposes connected with the administration of the government, may be controlled by the legislature, because such a corporation is not a contract within the purview of the Constitution of the United States. In those public corporations, there is, in reality, but one party, and the trustees or governors of the corporation are merely trustees for the public."

Judge COOLEY, in his work on constitutional limitations, quotes the rule laid down by Judge STORY, with entire approbation. Under the head "Legislative Control of Corporate Property," at page 235, he declares: "The legislative power of the State controls and disposes of the property of

the State. How far it may also control and dispose of the property of those agencies of government which it has created and endowed with corporate powers is a question which happily there has been very little occasion to discuss in the courts. Being created as an agency of government, it is evident that the municipality can not itself have that complete and absolute control and power of disposition of its property, which is possessed by individuals over their own. For it can hold and own property only for corporate purposes, and these purposes are liable at any time to be so modified by legislation as to render the property no longer available. Moreover, the charter rights may altogether be taken away; and in that case the legislature has deprived the corporation of its property by depriving it of its corporate capacity to hold it. And in many ways, while the corporation holds and enjoys property, the legislature must possess power to interfere with its control, at least incidentally; for the mere fact that the corporation possesses property can not deprive the State of its complete authority to mould and change the corporate organization, and enlarge or diminish its powers, which it possessed before. But whether the State can directly intervene and take away the corporate property, or convert it to other uses than those for which it was procured, or whether, on repealing a charter of incorporation, it can take to itself the corporate property, and dispose of it at its discretion, are different questions from any raised by the indirect and incidental interference referred to."

This author then quotes the rule as laid down by Judge STORY, and by Judge WASHINGTON, in the Dartmouth College case, and then proceeds as follows:

"The rule upon the subject seems to be this: When corporate powers are conferred, there is an implied compact between the State and the corporators that the property which they have the capacity to acquire under their charter shall not be taken from them and appropriated to other uses. If the State grants property to the corporation, the grant is an executed contract, which can not be revoked. The rights

acquired, either by such grants or by any other legitimate mode in which such a corporation can acquire property, are vested rights, and can not be taken away.    Nevertheless when the corporate powers are repealed, the corporate ownership ceases, and by modification of corporate powers, the legislature may, in other cases, affect and divest the rights of individual corporators, so far as they can be said to have any rights in public property; and in other ways, and by direct intervention, the legislature may exercise control over the disposition and use of property, subject to the restriction, that it must not be diverted to a use substantially different from that for which it was acquired."

Judge DILLON, in his work on municipal corporations, at page 85, holds this language: "The weight of opinion seems to be in favor of the doctrine, that there may be, in such corporations, rights under contracts and grants which are beyond destruction by the legislature, though not beyond legitimate legislative authority and control; but in the present state of the decisions the subject can not be fairly said to be settled."

I know of no American text writer who asserts a contrary view, and I know of but one decision, *Darlington* v. *Mayor, etc., of New York*, 31 N. Y. 164, where the legislative control is claimed to be quite without limit.

Before proceeding to the cases, so far as they exist, in which this rule has been applied, it will be well to examine our own decisions, to see whether they have recognized the rule laid down by Judge STORY; for if they have, notwithstanding its repudiation by so able a jurist as Judge DENIO, in the case last referred to, I am bound by it and its fair logical consequences.

In the case of *Armstrong* v. *The Board of Commissioners of Dearborn County*, 4 Blackf. 208, a case growing out of the re-location of the county seat, the rule as laid down by Story and Kent is quoted with approval.    The court says: "Our counties are all incorporated.    They are public corporations, created for public political purposes; and the

whole interest in them belongs to the public. The legislature have, therefore, in the language of Kent, under 'proper limitations, the right to change, modify, enlarge, or restrain them; securing, however, the property for the uses of those for whom it was purchased.'"

In *Edwards* v. *Jagers*, 19 Ind. 407, a case involving the validity of a clause in our constitution of 1852, authorizing the sale of county seminaries, WORDEN, Judge, speaking for the court, says: "The language of the Supreme Court of the United States, in the case of *Terrett* v. *Taylor*, 9 Cranch, 43, is in point here. The court say: 'In respect to public corporations which exist only for public purposes, such as counties, towns, cities, etc., the legislature may, under proper limitations, have a right to change, modify, enlarge, or restrain them; *securing, however, the property for the uses of those for whom, and at whose expense, it was originally purchased.*'" This emphasis is Judge WORDEN'S.

In the case just quoted from, the corporation before the court, namely, the Switzerland County Seminary, was held to be a private eleemosynary corporation, and that its charter, and the rights accruing under it, were protected by the federal constitution. The point there ruled does not directly affect the question before me, but the limitation upon legislative supremacy, as announced by STORY, is recognized with emphasis.

Numerous adjudged cases lay down this rule of limitation, but I shall not take the trouble to cite them, except as they may hereafter be referred to, to illustrate the application of the principle. In my judgment, the rule is abundantly established by authority, and is founded in reason and sound policy.

Is this rule to be applied in this case?

It is contended by the plaintiff's counsel that, under our constitution and under the peculiar powers conferred upon county commissioners by the act providing for the organization of county boards, approved June 17th, 1852, they are, as to certain powers conferred (including the power to acquire railroad stock), private corporations.

It is claimed that this act, and especially the fifth section thereof, greatly enlarges the powers of county corporations, and endows them with more vigorous corporate life than they had ever possessed in this State prior to its enactment.

Section 5 reads: "Such commissioners shall be considered a body corporate and politic by the name and style of 'The Board of Commissioners of the County of ———,' and as such, and in such name, may prosecute and defend suits, and have all other duties, rights and powers incident to corporations, not inconsistent with the provisions of this act."

It is also contended that a distinction is to be drawn between such powers as are conferred upon the plaintiff for public purposes exclusively, and such as are conferred for the purposes of private advantage and emolument; that the former powers belong to the plaintiff in its public, political, or municipal character, but as to the latter; though the public may derive a common benefit therefrom, the plaintiff is, *quoad hoc,* to be regarded as a private corporation. This distinction is taken and maintained by numerous cases, though there are some that hold that no such distinction can or does exist.

If this distinction may be relied upon as the basis of a decision in any case where the powers of a public corporation are under review, it seems quite clear to me that it can be relied upon here. I say this upon the following considerations: the constitution of Indiana expressly forbids the State to become a stockholder in any corporation or association. Section 12 of article 11 reads thus: "The State shall not be a stockholder in any bank, after the expiration of the present bank charter; nor shall the credit of the State ever be given or loaned in aid of any person, association, or corporation; nor shall the State hereafter become a stockholder in any corporation or association."

The constitution in other parts of it, as construed by the Supreme Court, declares that counties may become stockholders in a corporation, if the stock is paid for at the time of the subscription. According, then, to the fundamental

law, a county may, but the State may not, become a stock-holder in a railroad company. The section of the constitution authorizing counties to take stock is not self-executing. It requires the affirmative action of the legislature authorizing the board of commissioners to subscribe for stock. Such an enabling act is found in the railroad aid law of 1869. It has been held to be constitutional to wield the taxing power of the State in aid of a railroad company, for the reasons therefor given at large by the Supreme Court.

Now, the county levying a tax to create a fund with which to make a donation to, or to take stock in, a railroad company, is using a power given it as a public corporation; but in subscribing for stock in such company, to be held for its private advantage and emolument, it may be acting as a private corporation. At all events, it is difficult to see how a county holds such stock, in the strict sense spoken of in the books, as public property.

In legal contemplation, the board of commissioners of a county is the county (4 Ind. 315), and in my judgment, when such board acquires stock in a railroad company under the constitution and the act of 1869, it takes it and holds it, not strictly as an instrument of governmental agency, but as the trustee of the inhabitants of the county; not as property held for state purposes, but as property held for the benefit of the people of the county.

I do not mean to say that the board of commissioners took and held this stock, to all intents and purposes, as an individual holds his property, for under the authorities I do not think such a doctrine is maintainable. But I hold that stock thus acquired by a board is not acquired or held for public purposes, in the sense that the power of the legislature over it is omnipotent.

But whatever may be said of the soundness of an argument or a decision based upon the double character of the plaintiff, the one governmental, legislative, or public, the other in a sense proprietary or private, I feel that I am standing on absolutely sure ground, when I rely upon the

rule limiting legislative omnipotence, as laid down by those great and imperishable lights of the profession, Judge STORY and Chancellor KENT.

Does this rule, fairly applied, render the act in question clearly and palpably in conflict with that clause of our state constitution which declares that no law impairing the obligation of contracts shall ever be passed?

I think it is plain that the plaintiff acquired the stock in question by virtue of a contract with the railroad company. Here were two parties, the plaintiff on the one side, and the railroad company on the other, each competent to contract as to the subscription of stock. At all events, the plaintiff paid the money to the company, and the company in consideration thereof issued to the plaintiff the stock certificates in question; and as between them these acts created reciprocal rights and obligations. It is not questioned that the legal title to the stock certificates for a large number of shares of stock in the Lafayette, Muncie, and Bloomington Railroad Company was vested in the plaintiff in trust for somebody, at the time the act of 1872 was passed. For whom did the board hold this stock? Who were the beneficiaries?

The defendant's counsel claim that, as to this stock, the plaintiff was the trustee for the persons who paid the taxes with which the stock was purchased, and that, therefore, the statute does nothing more than compel the trustee to execute the trust in favor of the beneficiaries, and that in this view the statute is not only valid, but highly just and commendable.

No authority was cited in support of the assumption that the tax-payers above referred to were the only beneficiaries, and I imagine none can be found, or the persistent diligence of the counsel would have supplied it. The inhabitants of the county are the beneficiaries. The corporation known as the Board of Commissioners of Tippecanoe County, in my judgment, is the trustee, as to the property in question and all other property which it has, or can by law acquire, of the whole people of the county. Property is taxed to support

the government, because the government secures and protects property. Property is taxed to build railroads (so the theory runs) because railroads enhance the value of property, and are otherwise of public benefit. When a tax-payer pays a tax, lawfully assessed for county purposes, into the treasury, he ceases to have any specific and individual interest in it, and it becomes the property of the county for the benefit of all the people of the county. What specific or enforceable interest, distinct from the general public, did the largest tax-payer to the railroad appropriation have in the money he paid, after it was in the treasury, or to the stock certificates, after they were purchased, prior to the act in question? Clearly and palpably none whatever. If he has any legal right to the stock purchased, over and above that of the poorest man in our midst, he has it by virtue of the act of 1872, which is claimed to be void.

But, as a matter of fact, are the persons designated in the act, as entitled to the stock, the only ones who contributed to its purchase? Directly they undoubtedly are, but indirectly they certainly are not.

The three hundred and seventy-three thousand dollars voted to aid in the construction of the Lafayette, Muncie, and Bloomington Railroad, though nominally laid on the property of the county, was in fact a burden laid on the productive industry, on the labor, of the county. Tax burdens like this, though laid in the first instance on the property holden, distribute themselves on the entire labor of the community by a law as inevitable and uncontrollable as that which constrains water to find a common level. It is as impossible to ascertain, with any degree of certainty, who in reality shared the burdens of this tax, as it is to ascertain who bear the burden of the wholesale license tax to the United States government, nominally paid by O. W. Peirce & Co. This firm paid the tax to the government, but they charged the same, in whole or in part, upon the goods they sold, and these goods went charged with the same through

all intermediate persons till they reached the consumers, who finally shared, in whole or in part, in the original burden.

The assumption of law, that the persons described in the act are the only beneficiaries, and the assumption of fact, that they alone shared in the burden of the tax, are, in my judgment, wholly unfounded. The board of commissioners is the trustee of the inhabitants of the county, and the inhabitants of the county, not some of them, but all of them, are the beneficiaries.

It was admitted in argument by the defendant's counsel, that an act which should attempt to take this stock from the county, and give it to an individual for his own use, would be clearly beyond the legislative power. Yet what is sought to be done by the act in question, when stripped of the specious but unfounded assumption that the persons described in the act are the sole beneficiaries, is just what is admitted could not be done.

Could the legislature, under the rule limiting its power, as laid down by Judge STORY and approved with emphasis by Judge WORDEN of our own Supreme Court, constitutionally divest the county of its legal and beneficial ownership in this stock, and give it to the individuals contemplated, to hold as their private property?

If I am correct in the positions already laid down, the conclusion is inevitable, that the act in question, when viewed in the light of this rule, is unconstitutional and void. That the legislature might change the trustee or do many other things which need not be specified, so long as the uses to which the stock was devoted are left intact, is admitted. But this act, divesting the beneficial ownership of the plaintiff, and investing it in individuals, converting the public county use to individual private use, is, to my mind, clearly and plainly beyond the legislative power.

Many authorities were referred to by the counsel on both sides during the able and protracted argument, as bearing more or less directly upon the question in hand. I have given them all such examination as I could, but I have neither the

time nor the ability to review them, nor would such review subserve any good purpose.

I will, however, briefly allude to the case of *The Town of Milwaukee* v. *The City of Milwaukee*, 12 Wis. 93, relied upon as most strongly in point by the plaintiff's counsel, and the case of *Darlington* v. *Mayor, etc., of New York,* 31 N. Y. 164, equally relied upon by the defendant's counsel.

As to the opinion of Chief Justice DENIO in the latter case, it has already been said, that it repudiates the rule of limitation so generally recognized by text writers and adjudged cases, including the cases in our own court. He arrives at the conclusion that the legislative power over the property of public corporations is entirely without limitation. In my judgment, his conclusion is opposed to the great weight of the authorities, and is not, if I may be allowed to say so, sustained by the force of sound reasoning.

The former case was decided by Chief Justice DIXON, and the question, as he put it, and which he discussed, must be admitted to be almost exactly in point in this case. The question that he examined was, whether the legislature could constitutionally take property that belonged to the town (township) of Milwaukee by purchase, and give it to the city of Milwaukee. He denies emphatically the power of the legislature to do this, and goes into a very elaborate and candid discussion of the whole question. But it is claimed that all Judge DIXON said on this subject was *obiter*, and ought not to have the force of authority. But the question was assumed to be in the case, and it must be admitted that its solution was decisive of it. The same criticism urged against this case as authority may be made with equal, if not greater force, to the decision of Judge DENIO, in the case referred to. But whether what was said by Judge DIXON was said in the decision of a question necessarily before him or not, his argument is in my judgment sound, and his conclusion sustained by reason and the great weight of authority.

From the examination I have been able to give the subject (necessarily limited), aided by the very able discussion had at the bar, I am of the opinion that the act in question, so far as it affects the plaintiff in the matter complained of, is clearly and palpably unconstitutional and void, and that the defendant ought to be enjoined, according to the prayer of the complaint.

We fully endorse the conclusion thus reached by Judge VINTON. The primary and controlling question in the case is, whether the stock subscribed by the board of commissioners, in the name of the county of Tippecanoe, became the property of the county. The opinion of the majority of the court is based upon the theory that it did not, and it is manifest that if such theory is untrue, the conclusion based thereon is unsound and can not be supported. It is said in the opinion of the majority, that "the tax when collected does not go into the county treasury as such. It does not become the property of the county." We controvert both propositions. The tax when collected does go into the county treasury and is retained by the treasurer until he is required, by the warrant of the auditor, to pay it out for the purposes for which it was levied and collected. Such warrant can only issue upon the order of the commissioners. It is provided by the twelfth section of the act authorizing aid to railroads, that such "tax shall be collected in all respects as other taxes are collected for state and county purposes." Taxes collected for state and county purposes are paid into the county treasury, and are retained by the treasurer until paid out upon the warrant of the auditor. The difference is this, when taxes are collected for county purposes and paid into the county treasury, the money becomes a part of the general fund of the county, and may be expended for any legitimate county purpose; but the money collected under the railroad act is collected for a specific purpose and is held in trust by the county, until the commissioners have either subscribed for stock or donated the money to aid in the construction of the railroad indi-

cated. It is provided by the eighteenth section, that upon a failure of the railroad company to commence work within one year, or to complete the road within three years, the money so collected shall go into the general funds of the county or township, as the case may.be, and be used accordingly. The special tax is levied upon the taxable property and polls of the county and is collected in all respects as taxes for state and county purposes and is held by the county to be applied to the specified purpose, and if not so applied the money goes into the general funds of the county. If the money does not belong to the county, how can it be converted into the general fund of the county, if not used for the purpose for which it was collected? If the commissioners shall elect to donate the money to the railroad, then the money and all right thereto passes from the county and becomes vested in the railroad. But if the commissioners elect to subscribe for stock, then the subscription is to be made in the name of the county, and the railroad company is required to issue to, and in the name of, the county certificates of stock. Does not the county become a stockholder, and is it not entitled to vote at any meeting of stockholders? The stock in railroad corporations is transferable upon the books of the company. Will any one doubt that the county of Tippecanoe might have sold and transferred the stock subscribed in her name, and that she could have vested a good title thereto in the purchaser? We presume that no one can be found to question her power and right so to do. Has not the county been exercising her right as a stockholder in voting for the election of directors of the railroad company? Who ever called in question her legal right so to do? No one. But this further proposition is stated in the opinion of the majority of the court: "It does not thereby become the property of the county, in the sense that it would if purchased with county funds, and the primary object was the purchase of stock for its own use."

We are unable to appreciate the distinction which is attempted to be drawn between the payment for stock out of

the general fund of the county and the money collected upon the special tax. The money in each case is collected from the taxable property and polls of the county, and is collected in all respects the same. The money when collected for county purposes generally may be expended for any and all county purposes. The money collected for a special purpose can only be expended for that purpose, until the railroad has forfeited its right thereto, when it becomes a part of the general fund. The only difference between the two funds is while they are held by the county. When either is paid out, it is paid as the funds of the county and for the benefit of the county. It is conceded in the above quotation that the county might have subscribed for stock and paid for it out of the general funds of the county, if a sufficiency had been in the treasury, and that in such case the stock would have belonged to the county. We cannot see what difference it can make in the ownership of the stock, whether it is paid for out of the general fund, which has been raised by taxation, or out of a special fund raised by taxation. In either case, the money belongs to the county, and the stock purchased therewith should belong to the county.

The constitutionality of the act of May 12th, 1869, was sustained upon the ground that the sixth section of article 10 of the constitution authorized a county to subscribe for stock in an incorporated company, on the condition that it was paid for at the time the subscription was made, and that this express grant of power carried with it, by necessary implication, the power to adopt such means as may be adequate to accomplish the end proposed. It is a settled rule of construing a constitution that a court should look to the history of the times and examine the state of things existing when the constitution was framed and adopted. When the section of the constitution in question was framed and adopted, which empowers counties to subscribe for stock in an incorporated company, there was in existence, and had been for more than ten years, a statute which reads as follows:

VOL. XLIV.—36

" It shall be lawful for any county within this State to take stock in such association" (which association was organized to continue the construction of all or any part of the public works by private companies); "and for this purpose, the several boards doing county business are hereby empowered to subscribe therefor, and to levy a tax as for county purposes, not exceeding one dollar on every hundred dollars of assessed property, to be applied for such object; and the county shall hold such stock as individual stock is held in such association."

Is it not reasonable to suppose that the sixth section of article 10 was framed and adopted in view of and in reference to the existing law and long settled practice of the State, and that it was intended that when a county should subscribe for stock in an incorporated company, such county should hold such stock as individual stock was held in such company?

It is unreasonable to suppose that the framers of the constitution intended to provide that a county might use the money which had been raised by taxation, and by right belonged to all the inhabitants of the county, in paying for stock which had been subscribed for, the title to which was to be vested in some other person. We think the true meaning of the constitution is, that when a county should subscribe for stock, the subscription should be made in the name of the county, and that the county should hold it as corporate property, and in trust for all the inhabitants of the county; that the county should be a stockholder and have a voice and vote in the management of the incorporated company, and that the commissioners of the county might sell and assign such stock, and that the proceeds of such sale should go into and constitute a part of the general fund of the county. The act of the 28th of January, 1842, provided that a county might take stock in such association, etc.

The act of the 14th of February, 1848, relating to the Ohio and Mississippi Railroad, provided, that " it shall be lawful for the county commissioners of any county in the State of

Indiana, through which said railroad passes, for and on behalf of such county," to take stock, etc. *The Lafayette, etc., R. R. Co.* v. *Geiger,* 34 Ind. 206.

The sixth section of article 10 provides that a county may subscribe for stock, etc.

The act of May 12th, 1869, provides that the commissioners shall subscribe for stock in the name of the county.

Is it not plain and obvious that the constitutional convention and the legislature intended that when money which had been raised by taxation was used in paying for stock subscribed for in an incorporated company, it should be taken in the name of the county and held and disposed of as other corporate property? We deny the power of the legislature to require or authorize a county to pay for stock with money which had been procured by taxation, and appropriate the stock to a private use. If the legislature had possessed the power and had provided that the stock should be taken in the name of the sheriff of the county, the stock would still have belonged to the county, though held in trust by the sheriff, and could not have been appropriated to any private use. In such case, the sheriff would hold such stock charged with a trust so sacred that even the legislature could not destroy it and convert it to private uses.

The opinion of the majority of the court seems to have been greatly influenced by the alleged fact, that the act of May 12th, 1869, does not provide how the stock to be subscribed for by the county shall be held, how it shall be managed, or to what purpose it or its dividends shall be applied. The act of May 12th, 1869, provides, that the stock must be taken in the name of the county, and as it was paid for with the funds of the county, it must necessarily be held for the use of the county. It was wholly unnecessary that the said act should provide how it should be managed, or to what purpose it or its dividends should be applied, as ample provision had already been made for such management and use. Section 10 of article 6 of the constitution provides, that "the General Assembly may confer upon the boards doing county

business in the several counties, powers of a local, administrative character."

An act approved June 17th, 1852, provides, that there shall be organized in each county in this State a board of commissioners for transacting county business, to consist, etc.

It is provided by the thirteenth section of said act, that " such commissioners in their respective counties shall have power at their meetings : 1. To make orders respecting the property of the county in conformity to law," etc.

By the above act, the Board of Commissioners of Tippecanoe county was vested with full and ample power to manage and control the stock subscribed in the name of the county, and to appropriate to legitimate county purposes the proceeds or dividends arising therefrom. It is a settled rule of construction that the legislature is presumed to have in view, in the passage of a law, all existing laws relating to the same subject.

Having arrived at the conclusion that the stock subscribed in the name of the county of Tippecanoe became the property of the county, and that the right and title thereto was vested in the county, we proceed to inquire whether the legislature possesses the power to divest a vested right, or, in other words, to take from the county of Tippecanoe the property which belongs to her and give the same to private citizens for private purposes, thus defeating the public purpose to which it had been dedicated.

Before we proceed to an examination of the authorities bearing upon the question under examination, we desire to express our appreciation of the fairness of the majority of the court in citing and quoting from authorities bearing upon both sides of the question in dispute. This action of the court will greatly relieve us of labor; but the proper illustration of our views renders it necessary for us to make a brief reference to the authorities cited in the opinion of the court, and this we will do in the order in which the references are made.

Judge Cooley, one of the most eminent and distinguished writers upon constitutional law, deduces from all the author-

ities the rule that the legislature may exercise control over the disposition and use of property belonging to a county, subject to the restriction that it must not be diverted to a use substantially different from that for which it was acquired. That is to say, as we understand it, that if the stock in question was acquired with county funds, for county purposes, it can not be diverted to private uses.

The case of *Darlington* v. *Mayor, etc., of New York*, 31 N. Y. 164, goes further than any other American case in asserting the absolute and unrestrained control of the legislature over property belonging to municipal corporations, but in our opinion it does not go far enough to sustain the constitutionality of the law in question. The question in that case was, whether the legislature possessed the power to make the property of the city liable to the payment of a judgment recovered against the city for damages sustained by a riot, and it was held that such power existed. The question was not whether the legislature could take the property of the city and give it to private persons, but whether the property of the city was subject to be sold upon execution to satisfy a judgment against the city. The court held that the property of the city was subject to sale upon execution to satisfy such a judgment, in the same manner and to the same extent as upon any other judgment. It is plainly inferable from the reasoning of the court, that an act would have been held unconstitutional which directed the appropriation of public property to private use. The learned judge says: "Let us suppose the city to be the owner of a parcel of land not adapted to any municipal use, but valuable only for sale to private persons for building purposes, or the like. No one, I think, can doubt but what it would be competent for the legislature to direct it to be sold, and the proceeds to be devoted to some municipal or other public purpose, within the city, as a court-house, a hospital, or the like."

We do not doubt the power of the legislature to so far control the action and discretion of a municipal corporation as to divert public property from one public use to another

public use within the, limits of such corporation. We do not doubt that the legislature might have directed the sale of the county stock in question and appropriated the proceeds to the erection of a court-house, jail, or hospital, or the purchase of a poor-farm within the county. Such action on the part of the legislature would not have divested the title of the county to the stock, but would have changed the manner of its use.' The proceeds of the sale would have remained the property of the county, and would have been appropriated to legitimate municipal and public purposes within the corporation. An additional extract from the opinion of Judge DENIO will conclusively show that the court did not intend to hold that property belonging to a municipal corporation could be appropriated to a private use. The learned judge says: "In one sense it may be conceded that it is taken for a public use; for when the State undertakes to indemnify the sufferers from riots, the executing of that duty is a public concern, and the expenditure is on public account. It is a public use in the same sense as the expenditure of money for the erection of court-houses and jails, the construction of roads and bridges, and the support of the poor. It is taken for an object which the legislature has determined to be of public importance, and for the interest of the State."

In our opinion, the above case does not support the opinion of the majority of the court, but sustains the view taken by us.

The case of *The State of Maryland* v. *The Baltimore, etc., R. R. Co., supra,* has but little application to the present case, for the reason that it was held that the payment of the million of dollars was not a matter of contract, but was a penalty imposed by the state, and that as the counties named had no vested right in such penalty, it might be released by the state. There can be no doubt as to the power of the state to release a penalty. The power was not called in question in the above case, but it was conceded that if it was a penalty and not a vested right, the state might release it.

The case of *East Hartford* v. *The Hartford Bridge Co.*, *supra*, turned upon whether the ferry was held by a contract or license, and it was held that there was no element of contract or vested right. The learned judge was careful to distinguish the case from one where private property was involved. He says: " There is no private interest or property affected by this course, but only public corporations and public privileges. It may be otherwise in case of private bodies, or individuals, or of private property granted or acquired. The legislature might not be justified to revoke, transfer, or abolish them on account of the private character of the party or the subject."

The case of *The County of Richland* v. *The County of Lawrence, supra*, is clearly distinguishable from the present one. In that case, the money was donated by the state to Lawrence county, to be expended in the construction of bridges and repairs of the roads. Subsequently, a portion of Lawrence county was detached, and a new county was formed of that and a portion taken from Clay county, and the legislature directed that a portion of the money which had been paid to Lawrence county should be paid to Richland county, and expended therein in the improvements of roads and the construction of bridges, and the like. The effect of the act was to take from one county money which had been donated by the state, and direct the expenditure of the same for public purposes in another county, which had been in part formed out of the territory which had belonged to Lawrence county. This was not diverting public property to private use. The decision of the court was based upon the fact that the money had not been expended. The court say: " Before its expenditure, we cannot doubt that the legislature had entire control over the fund, either to resume it altogether, or to change the purposes for which it was originally designed to be expended."

The case of *Dennis* v. *Maynard, supra*, involved, in substance, the same question as in the preceding case and was mainly decided on that case.

The case of *The State, etc.,* v. *The County Court, etc.,* 34 Mo. 546, is very much in point in the present case, and very strongly supports the views expressed by us. The court say: "The funds of the county are not strictly private property. They certainly do not belong to the citizens who may have contributed them. They are rather public property, the property of the State acquired from the people and the property in the county, and to be used and expended for the benefit of the same people and property."

The validity of the law was sustained, because the money which belonged to the county was directed to be expended for a public purpose within the county. There was no attempt on the part of the legislature to divert public funds to private use, as is done in the present case. The law, as we understand it to be, is stated with great clearness, accuracy, and force by the learned and very eminent jurist who delivered the opinion of the court, when he says: "Whilst the legislature cannot take away from a county its property, it has full power to direct the mode in which the property shall be used for the benefit of the county."

The only question decided in *Grim* v. *Weissenberg School District, supra,* having any application to the present case, is, that the legislature cannot impair the obligation of a contract and to that extent is opposed to the opinion of the majority of the court.

The case of *The Town of Milwaukee* v. *The City of Milwaukee,* 12 Wis. 93, deserves a more extended review than is given in the opinion of the majority of the court. The following extract from the opinion of the court has a direct and important bearing upon the question involved in this case. The court say:

"The difficulty about the question is, to distinguish between the corporation as a civil institution or delegation of merely political power, and as an ideal being endowed with the capacity to acquire and hold property for corporate or other purposes. In its political or governmental capacity, it is liable at any time to be changed, modified or

destroyed by the legislature; but in its capacity of owner of property, designed for its own, or the exclusive use and benefit of its inhabitants, its vested rights of property are no more the subject of legislative interference or control, without the consent of the corporators, than those of a merely private corporation or person. Its rights of property, once acquired, though designed and used to aid it in the discharge of its duties as a local government, are entirely distinct and separate from its powers as a political or municipal body. It might sell its property, or the same might be lost or destroyed, and yet its powers of government would remain. In its character of a political power, or local subdivision of government, it is a public corporation, but in its character of owner of property, it is a private corporation, possessing the same rights, duties and privileges as any other. This distinction is clearly laid down and established in the case of *Bailey* v. *The Mayor, etc., of New York,* 3 Hill, 531, and authorities there cited. The inviolability by legislative interposition of the rights and franchises of a private corporation, in cases where there is not, by its charter, or the constitution of the State by which it is granted, a reservation of power to repeal or modify, is demonstrated and established in the case of *Dartmouth College* v. *Woodward,* 4 Wheat. 518, by a force of reasoning and power of argument, to the strength and clearness of which nothing can possibly be added. It was there held that the charter of such a corporation was a contract within the meaning of the first subdivision of section 10 of article 1 of the constitution of the United States, which declares that no state shall pass any law impairing the obligation of contracts. The same provision occurs in the twelfth section of the first article of our state constitution. The reasoning of that case extends as well to the power of the legislature to interfere with the franchises as the rights of property of such corporation; but it is only with respect to the latter that it can be considered applicable to the question we are now considering. And there it is clearly so. Every argument used goes with equal

force to prove that the legislature has no power to divest a municipal corporation of its property, previously acquired by purchase or otherwise. This want of power depends, not upon the character of the corporation, but upon the nature of the right. The right to repeal or modify is not a right to interfere with vested rights of property. The former may exist without the latter. If the legislature possessed both, the exercise of one would not depend on the other. How the total repeal of the charter of a municipal corporation, without provision as to the disposition of its property (a circumstance not likely to occur), would affect such property, or the rights of its inhabitants, we are not called upon here to decide. It is sufficient that the corporation of the town of Milwaukee still continues to exist, and so long as it does so, it is impossible to make a distinction between its rights of property and those of a corporation merely private. Both are, and ought, in the nature of the things, to be equally sacred. In *Terrett* v. *Taylor*, 9 Cranch, 43, the right of a state government to dispossess a private corporation of its property, was directly passed upon and denied."

The same court, in the subsequent case of *The State of Wisconsin, ex rel., etc.,* v. *Haben,* 22 Wis. 660, uses this language:

"It is well settled as to all matters pertaining to vested rights of property, whether real or personal, and to the obligation of contracts, that municipal corporations are as much within the protection of the federal constitution as private individuals are. The legislature cannot divest a municipal corporation of its property, without the consent of its inhabitants, nor impair the obligation of a contract entered into with or in behalf of such corporation."

The case of *Bailey* v. *The Mayor, etc.,* 3 Hill N. Y. 531, was an action against the corporation of the city of New York for injuries occasioned by the negligent and unskilful construction of a dam on the Croton river, it appearing that the dam was a part of the work undertaken pursuant to the act for supplying the city with pure and wholesome water, and that it

was built by persons employed for the purpose under a contract with the water commissioners. The liability of the city depended upon whether the water commissioners were the agents of the state or the corporation of the city. Mr. Chief Justice NELSON, in delivering the opinion of the court, draws with great accuracy and clearness the line of distinction which exists between the powers of the legislature over a municipal corporation in its character as a municipal or public body and its character as a property owner. He says: "The powers conferred by the several acts of the legislature authorizing the execution of this great work are not, strictly and legally speaking, conferred for the benefit of the public. The grant is a special, private franchise, made as well for the private emolument and advantage of the city, as for the public good. The state, in its sovereign character, has no interest in it. It owns no part of the work. The whole investment under the law and the revenue and profits to be derived therefrom are a part of the private property of the city; as much so as the lands and houses belonging to it, situate within its corporate limits. The argument of the defendants' counsel confounds the powers in question with those belonging to the defendants in their character as a municipal or public body—such as are granted exclusively for public purposes to counties, cities, towns and villages, where the corporations have, if I may so speak, no private estate or interest in the grant. As the powers in question have been conferred upon one of these public corporations, thus blending in a measure those conferred for private advantage and emolument with those already possessed for public purposes, there is some difficulty, I admit, in separating them in the mind, and properly distinguishing the one class from the other, so as to distribute the responsibility attaching to the exercise of each. But the distinction is quite clear and well settled, and the process of separation practicable. To this end, regard should be had, not so much to the nature and character of the various powers conferred, as to the object and purpose of

the legislature in conferring them. If granted for public purposes exclusively, they belong to the corporate body in its public, political or municipal character. But if the grant was for purposes of private advantage and emolument, though the public may derive a common benefit therefrom, the corporation, *quoad hoc*, is to be regarded as a private company. It stands on the same footing as would any individual or body of persons upon whom the like special franchises had been conferred. *Dartmouth College* v. *Woodward*, 4 Wheat. 668, 672; *Philips* v. *Bury*, 1 Ld. Raym. 8; 2 T. R. 352, S. C.; *Allen* v. *McKean*, 1 Sumner, 297; *The People* v. *Morris*, 13 Wend. 331, 338; 2 Kent's Com. 275, 4th ed.; *U. S. Bank* v. *Planters' Bank*, 9 Wheat. 907; *Clark* v. *Corp. of Washington*, 12 Wheat. 40; *Moodalay* v. *The East India Co.*, 1 Brown C. C. 469. Suppose the legislature, instead of the franchise in question, had conferred upon the defendants banking powers, or a charter for a railroad leading into the city, in the usual manner in which powers are conferred on private companies; could it be doubted that they would hold them in the same character, and be subject to the same duties and liabilities? I cannot doubt but they would. These powers, in the eye of the law, would be entirely distinct and separate from those appertaining to the defendants as a municipal body. So far as related to the charter thus conferred, they would be regarded as a private company and be subject to the responsibilities attaching to that class of institutions. The distinction is well stated by the master of the rolls in *Moodalay* v. *The East India Company*, 1 Brown C. C. 469, in answer to an objection made by counsel. There the plaintiff had taken a lease from the company, granting him permission to supply the inhabitants of Madras with tobacco for ten years. Before the expiration of that period, the company dispossessed him, and granted the privilege to another. The plaintiff, preparatory to bringing an action against the company, filed a bill of discovery. One of the objections taken by the defendants was, that the removal of the plaintiff was incident to their character as a

sovereign power, the exercise of which could not be questioned in a bill or suit at law. The master of the rolls admitted that no suit would lie against a sovereign power for anything done in that capacity; but he denied that the defendants came within the rule. 'They have rights,' he observed, 'as a sovereign power, they have also duties as individuals; if they enter into bonds in India, the sums secured may be recovered here. So in this case, as a private company they have entered into a private contract, to which they must be liable.' It is upon the like distinction that municipal corporations, in their private character as owners and occupiers of lands and houses, are regarded in the same light as individual owners and occupiers, and dealt with accordingly. As such, they are bound to repair bridges, highways and churches; are liable to poor rates; and, in a word, to the discharge of any other duty or obligation to which an individual owner would be subject. 2 Inst. 703; *Thursfield* v. *Jones,* Sir T. Jones, 187; *Rex* v. *Gardner,* Cowp. 79; *Mayor of Lynn* v. *Turner, Id.* 86; *Henly* v. *Mayor of Lyme,* 5 Bing. 91; 1 Bing. N. C. 222, S. C. in the House of Lords."

In addition to the reference made in the opinion of the majority of the court to the case of *City of Louisville* v. *Prcs. and Treas., etc., supra,* we make the following extract from the opinion of the court:

"If, as reason and observation prove, and as the authorities referred to assume, a municipal corporation may acquire property which does not thereby belong to the State, and may appropriate it to uses which the State can not defeat or control, it is not, in such acts of acquisition and appropriation, the mere instrument or agent of the government representing and acting for it, and these acts, though done under the authority of law, cannot be regarded as acts of the State or its government, or as a part of its administration, nor can they of themselves impart that character to the object of the appropriation, nor subject it to a legislative power which did not attach either to the object of the appropriation or to the property itself before it was appropriated;

but such property, so far as the State is concerned, has all the attributes and is entitled to all the protection of private property."

Let us apply the principle above enunciated to the present case. Although the tax, which was levied to aid in the construction of the railroad, was levied and collected in pursuance of law, it was collected from the property and polls of the county, for the purpose of aiding in the construction of a work of public importance, yet, when such aid had been rendered, the public purpose of the law was accomplished, and the stock which had thus been paid for became the property of the county, and " so far as the State is concerned, has all the attributes and is entitled to all the protection of private property."

In the case of *The Louisville, etc., R. R. Co.* v. *The County Court of Davidson County, supra,* no questions of contract or divesting vested rights arose or were decided by the court, for the reason that the original act provided that the stock should be issued to the tax-payers in proportion to the tax paid by them. If the subscription had been made in the name of the county, and the stock issued to the county, the question would then have arisen as it does in this case, whether the legislature could have taken the property of the county and given it to private citizens of the county.

Upon that point, the language of the Supreme Court of Vermont, in *Atkins* v. *The Town of Randolph,* 31 Vt. 226, is very appropriate. The court say:

"Since some early judicial notions of Chief Justice GIBSON, no judge or court has intimated that the property of one person could be taken without his consent and transferred to another, either with or without compensation, merely by force of legislative enactment. In whatever form the question may arise, the uniform judgment of the courts of this country has settled that such would be unconstitutional and void legislation."

In the same opinion the following language is used:

"So far as a municipal corporation is endowed by law with

the power of contracting, and as such, is made capable of acquiring, holding and disposing of property, and subject to the liabilities incident to the exercise of such power and capacity, thus being invested with legal rights as to property and contracts, and made subject to legal liabilities in respect thereto, to be ascertained and enforced by suit in the ordinary judicial forums, upon the same principles, and by the same means as in case of a private corporation, such municipal corporation must stand on the same ground of exemption from legislative control and interference as a private corporation."

In *Touchard* v. *Touchard*, 5 Cal. 306, it is said: "On the other hand, a corporation, both by the civil and common law, is a person, an artificial person, and although a municipal corporation has delegated to it certain powers of government, it is only in reference to those delegated powers that it will be regarded as a government. In reference to all other of its transactions, such as affect its ownership of property in buying, selling or granting, and in reference to all matters of contract, it must be looked upon and treated as a private person, and its contracts construed in the same manner and with like effect as those of natural persons."

We have arrived at a very different conclusion, in respect to the weight and effect of the authorities bearing upon the constitutionality of the act in question, to what the majority of the court have. We think they satisfactorily and conclusively show that the act in question is unconstitutional and void.

A doubt is suggested in the opinion of the majority of the court as to whether the same principles of law apply to counties that do to cities. There is a difference as to the liability of counties and cities for injuries occasioned by the wrongful acts of the officers of such municipal corporations. The liability of cities is much greater than that of counties. But we have found no authority which holds that the legislature has any greater power or control over the property of

a county than it has over that of a city, and we know of no reason why any difference should exist.

Finally, it is said in the opinion of the majority of the court that the act, the validity of which is involved, is eminently just and equitable, and the question is asked, what objection can be urged against it?

In answer to the question propounded, we urge the following objections:

1st. In our opinion the act is not only against natural right, but the spirit of the constitution, because it violates the obligation of contract and attempts to divest a vested right.

2d. It is an act of bad faith to such counties as have subscribed for stock in railroads in the name and for the use of the county.

3d. It is unfair to the voters of such counties as have imposed a tax upon their property and polls, under the act of May 12th, 1869, to aid in the construction of some railroad, and especially is such the case in reference to the county of Tippecanoe; for in that county the question, and the only one, submitted to the voters was, whether they were in favor of subscribing for stock in the name of the county. The result of the vote might have been very different, if the proposition voted upon had been that the voters should become stockholders in the railroad company in proportion to the amount of taxes paid, and that such stockholders should be individually liable for all labor done in the construction of said road that should remain unpaid after the assets of the corporation should have been exhausted.

4th. The act in question is unfair and unjust to the creditors of the railroad company, because it provides that the persons who shall become stockholders by virtue thereof shall hold the same relieved of any individual liability.

5th. The act in question will operate injuriously upon the railroad and upon the citizens of the county. When the county was the owner of the stock, her voice and vote exercised a controlling and healthy influence upon the management of the railroad, and inspired confidence in the

community as to the completion of the enterprise, and that its affairs would be safely and economically conducted. Laborers could be procured, because they could look to the individual liability of the largest stockholders for the payment of their wages. If the law is held valid, and the stock is distributed among the tax-payers of the county, the amount held by the most of the tax-payers will be too small to induce them to look after the management of the road, and especially as they are relieved of individual liability for the debts of the railroad company. The result will be that in a short time the stock will be concentrated in the hands of a few men, who will pay but little therefor and will exercise a controlling influence in the management of the railroad, relieved of all individual liability as such stockholders; or if the stock is retained by the tax-payers, they will fail to vote, or if they do vote, they will be so divided in opinion that their influence will be neutralized, if not destroyed. In either event, the effect can not fail to be disastrous to the railroad and the prosperity of the county, so far as it depends upon the completion and successful management of such railroad.

6th. The act in question is a fraud and imposition upon the other stockholders. It is provided by section 38 of the railroad act of May 11th, 1852, that "the stockholders shall be individually liable for all labor done in the construction of said road that shall remain unpaid after the assets of the corporation shall have been exhausted." It is provided by the third section of the act of December 17th, 1872, " that the stock so issued under the provisions of this act being involuntary in its character, no personal liability shall attach to the original holder thereof for any debt contracted by the railroad company." The effect will be, that while the other stockholders will be individually liable for the debts of the railroad, they may have their voice stifled, and their influence in the management of the railroad destroyed, by the voice and influence of stockholders who

have no individual liability for the debts of the company. This will be unfair, unjust, inequitable, and disastrous to the railroad.   The stockholders should all stand upon the same footing and · be restrained and influenced by the same considerations and motives.

7th.  In our opinion, all such legislation will have a demoralizing and deleterious influence upon the people of the State, because it teaches a disregard for the sacredness and binding force of contracts and obligations, and makes the purposes and interests of a few persons paramount to the best interests of the community.

Believing as we do, that, under the constitutions of the United States and of this State, the legislature is prohibited from divesting or attempting to divest, without its consent, a municipal corporation of its rights of property lawfully acquired, we have felt it to be our duty to so declare and to state our reasons for such convictions at considerable length.

In our opinion, the judgment of the court below should be in all things affirmed.

NOTE.—Since the decision of this case, the case of *Spaulding* v. *Town of Andover* has. been decided by the Supreme Court of New Hampshire, to which we refer as strongly sustaining the views expressed in the opinion of the minority of the court.

*Petition for a rehearing overruled.*

Appealed to the Supreme Court of the United States.—*Rep.*